# No. 24-2392

# United States Court of Appeals
*for the*
# Third Circuit

RHONDA ALLEN, STEHLE HARRIS, DAVID ELLIOTT,
Individually and on behalf of all other similarly situated,

*Plaintiffs-Appellants*,

v.

EVONIK CORPORATION, PRESIDENT OF EVONIK CORPORATION,
BOARD OF DIRECTORS OF EVONIK CORPORATION, EVONIK
INVESTMENT COMMITTEE; JOHN DOES 1-30,
Whose Names Are Currently Unknown,

*Defendants-Appellees*.

_____

On Appeal from the United States District Court
For the District of New Jersey
No. 2:20-cv-02202-MCA-MAH (Hon. Madeline Cox Arleo)

## BRIEF OF APPELLANTS AND JOINT APPENDIX I, JA000001-JA000010

Mark K. Gyandoh
CAPOZZI ADLER, P.C.
312 Old Lancaster Road
Merion Station, PA 19066
Telephone: (610) 890-08200
Fax: (717) 233-4101
Email: markg@capozziadler.com

*Counsel for Plaintiffs-Appellants*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 and Third Circuit Local Appellate Rule 26.1, Appellants, Rhonda Allen, David Elliot, and Stehle Harris, make the following disclosure:

(1)    For nongovernmental corporate parties, please list all parent corporations:

*Not applicable.*

(2)    For nongovernmental corporate parties, please list all publicly held companies that hold 10% or more of the party's stock:

*Not applicable.*

(3)    If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

*Not applicable.*

4)    In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: (1) the debtor, if not identified in the

i

case caption; (2) the members of the creditors' committee or the top 20 unsecured creditors; and, (3) any entity not named in the caption which is an active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

   *Not applicable.*


Dated:  October 15, 2024                    */s/ Mark K. Gyandoh*

## TABLE OF CONTENTS

I.    JURISDICTIONAL STATEMENT ................................................................1

    A.    The District Court's Jurisdiction ................................................1

    B.    The Court of Appeals' Jurisdiction............................................1

    C.    Timeliness of Appeal ................................................................1

    D.    Final Judgment............................................................................1

    E.    Statement of Related Cases and Proceedings ...........................1

II.   STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ...................2

    A.    Concise Statement of the Case ................................................2

    B.    Procedureal History ................................................................3

    C.    Rulings for Review ................................................................4

III.  SCOPE OF REVIEW ................................................................................5

    A.    Review of a Motion for Summary Judgment ...........................5

    B.    ERISA's Prudence Standard....................................................6

IV.   SUMMARY OF THE ARGUMENT ................................................................8

V.    FACTS ................................................................................................8

    A.    The Plan and The Parties ................................................8

    B.    The Parties' Experts....................................................................9

    C.    The Plan's Fee Structure................................................10

D.      The Plan's TPC ......................................................................11

E.      The Plan's Recordkeeping Fees.............................................13

F.      The Plan's Underperforming Funds .......................................19

        1.      Artisan Fund ................................................................22

        2.      Fort Washington Fund .................................................23

VI.   ARGUMENT .................................................................................25

A.      Expert Opinions Create Genuine Disputes............................25

B.      Recordkeeping Fee Disputes .................................................30

C.      TPC Disputes .........................................................................33

        1.      Dyson's Multifaceted Analysis ...................................33

        2.      Actively Managed Versus Passively Managed Funds ...............40

D.      Other Disputes Precluding Summary Judgment....................42

        1.      The Plan's Investments ...............................................42

        2.      The IPS .......................................................................47

        3.      Recordkeeping Disputes..............................................49

E.      Plaintiffs' Derivative Claims .................................................52

VII.  CONCLUSION .............................................................................53

<u>**TABLE OF AUTHORITIES**</u>

PAGE(S)

**Cases**

*Alco Industries, Inc. v. Wachovia Corp.*,
527 F. Supp. 2d 399 (E.D. Pa. 2007) ................................................................. 39, 48

*Armano v. Martin*,
703 F. App'x 111 (3d Cir. 2017) ................................................................ 29

*Bell v. Pension Comm. of ATH Holding Co., LLC*,
No. 115-cv-02062, 2019 WL 387214 (S.D. Ind. Jan. 30, 2019 .................... 34, 35, 50

*Board of Trs. of S. California IBEW-NECA Defined Contribution Plan
v. Bank of N.Y. Mellon Corp.*,
No. 09-cv-6273, 2011 WL 6130831 (S.D.N.Y. Dec. 9, 2011) ................................ 6

*Brotherston v. Putnam Invs., LLC*,
907 F.3d 17 (1st Cir. 2018) ...................................................... 38, 39, 40, 41

*Brundle ex rel. Constellis Emp. Stock Ownership Plan v. Wilmington Tr.*,
919 F.3d 763 (4th Cir. 2019) ................................................................ 49

*Bussian v. RJR Nabisco, Inc.*,
223 F.3d 286 (5th Cir. 2000) .................................................... 26, 31, 50

*Cates v. Trs. of Columbia Univ. in City of New York*,
No. 16-cv-06524, 2019 WL 8955333 (S.D.N.Y. Oct. 25, 2019),
*R. & R. adopted*, 2020 WL 1528124 (S.D.N.Y. Mar. 30, 2020) ................... *Passim*

*Chisolm v. McManimon*,
275 F.3d 315 (3d Cir. 2001) ................................................................ 5

*Cunningham v. Cornell Univ.*,
No. 16-cv-6525, 2019 WL 4735876 (S.D.N.Y. Sept. 27, 2019) ........................ 43, 49

*Dardaganis v. Grace Cap. Inc.*,
889 F.2d 1237 (2d Cir. 1989) ................................................................ 21

*Davis v. Magna Int'l of Am., Inc.*,
No. 20-11060, 2023 WL 3821807 (E.D. Mich. June 5, 2023) ...................... *Passim*

*Evans v. Akers*,
534 F.3d 65 (1st Cir. 2008) ................................................................. 38

*Falberg v. Goldman Sachs Grp.*,
No. 22-cv-2689, 2024 WL 619297 (2d Cir. Feb. 14, 2024) ............... 48, 49

*Feinberg v. T. Rowe Price Group, Inc.*,
No. 17-cv-427, 2021 WL 488631 (D. Md. Feb. 10, 2021) ................ 28, 51

*Fink v. Nat'l Sav. & Tr. Co.*,
772 F.2d 951 (D.C. Cir. 1985) ............................................................ 49

*Ford v. Panasonic Corp. of N. Am.*,
284 F. App'x 901 (3d Cir., 2008) ........................................................ 26, 49

*George v. Kraft Foods Global, Inc.*,
641 F.3d 786 (7th Cir. 2011) ......................................................... 26, 46, 49

*Graden v. Conexant*,
496 F.3d 291 (3d Cir. 2007) ............................................................... 37, 38

*Harley v. Minnesota Mining & Mfg. Co.*,
42 F. Supp. 2d 898 (D. Minn. 1999),
*aff'd sub nom. Harley v. Minnesota Min. & Mfg. Co.*,
284 F.3d 901 (8th Cir. 2002) ............................................................ 34, 45

*Howard v. Shay*,
100 F.3d 1484 (9th Cir. 1996) ............................................................ 50

*Hughes v. Nw. Univ.*,
142 S. Ct. 737 (2022) ................................................................... 7, 33, 44

*Hugler v. Byrnes*,
247 F. Supp. 3d 223 (N.D.N.Y. 2017) .............................................. 34, 40

*Jacobs v. Verizon Commc'ns*,
No. 16-cv-1082, 2023 WL 3027311 (S.D.N.Y. Apr. 20, 2023) ......... 43, 44

*Jenkins v. Yager*,
444 F.3d 916 (7th Cir. 2006) ............................................................... 45

*Johnson v. PNC Fin. Servs. Grp., Inc.*,
2021 WL 3417843 (W.D. Pa. Aug. 3, 2021) ....................................... 52

*Jones v. DISH Network Corp.*,
No. 22-cv-00167, 2023 WL 7458377 (D. Colo. Nov. 6, 2023),
*report and recommendation adopted*,
No. 22-cv-00167, 2023 WL 8170913 (D. Colo. Nov. 24, 2023) .......................... 48

*Karg v. Transamerica Corp.*,
No. 18-cv-134, 2019 WL 3938471 (N.D. Iowa Aug. 20, 2019)............................ 46

*Klawonn v. Bd. of Directors for the Motion Picture Indus. Pension Plans*,
No. 22-cv-209194, 2022 WL 17224708 (C.D. Cal. Sept. 27, 2022) .................... 41

*Laborers Nat. Pension v. Nor. Trust Advisors*,
173 F.3d 313 (5th Cir. 1999) ................................................................... 20

*Le Pape v. Lower Merion Sch. Dist.*,
103 F.4th 966 (3d Cir. 2024) ..................................................................... 6

*Mator v. Wesco Distribution, Inc.*,
102 F.4th 172 (3d Cir. 2024)..........................................................*Passim*

*Matney v. Barrick Gold of N. Am.*,
80 F.4th 1136 (10th Cir. 2023)................................................................. 36

*Mattson v. Milliman, Inc.*,
No. 22-cv-0037, 2024 WL 340589 (W.D. Wash. Jan. 30, 2024) ........................ 48

*McCaffree Fin. Corp. v. ADP, Inc.*,
No. 20-cv-205492, 2023 WL 2728787 (D.N.J. Mar. 31, 2023) ........................... 37

*McCool v. AHS Mgmt. Co., Inc.*,
No. 19-cv-01158, 2023 WL 2752400 (M.D. Tenn. Mar. 31, 2023) .................. 28, 51

*Miguel v. Salesforce.com, Inc.*,
20-cv-01753, 2024 WL 1222092 (N.D. Cal. Mar. 20, 2024) .............................. 36

*Mills v. Molina Healthcare, Inc.*,
694 F. Supp. 3d 1272 (C.D. Cal. 2023) .................................................... 27

*Nunez v. B. Braun Medical* (*Nunez I*),
No. 20-cv-04195 (E.D.P.A. Apr. 21, 2023) ....................................*Passim*

*Olsen v. Hegarty*,
180 F. Supp. 2d 552 (D.N.J. 2001) ...................................................... 42, 46

*In Re Omnicom Group Inc. ERISA Litigation*,
No. 20-cv-4141, 2022 WL 18674830 (S.D.N.Y Dec. 23, 2022) ........................ 28, 51

*Pension Fund v. Omni Funding*,
731 F. Supp. 161 (D.N.J. 1990) ........................................................................ *Passim*

*Ramara, Inc. v. Westfield Ins. Co.*,
814 F.3d 660 (3d Cir. 2016) .............................................................................. 33

*Reetz v. Lowe's Companies, Inc.*,
No. 18-cv-00075, 2021 WL 535160 (W.D.N.C. Feb. 12, 2021) ........................... 33

*Roth v. Sawyer-Cleator Lumber Co.*,
16 F.3d 915 (8th Cir. 1994) .............................................................................. 49

*Sacerdote v. New York Univ.*,
9 F.4th 95 (2d Cir. 2021) .................................................................................. 29, 51

*Scalia v. Reliance Tr. Co.*,
No. 17-cv-4540, 2021 WL 795270 (D. Minn. Mar. 2, 2021) ................................ 27

*Smith v. CommonSpirit Health*,
37 F.4th 1160 (6th Cir. 2022) ........................................................................... 41, 47

*Sweda v. Univ. of Pa.*,
923 F.3d 320 (3d Cir. 2019) .............................................................................. 7, 36

*Tatum v. RJR Pension Inv. Comm.*,
761 F.3d 346 (4th Cir. 2014) ............................................................................. 20

*Terraza v. Safeway Inc.*,
No. 16-cv-03994, 2019 WL 12872958 (N.D. Cal. Apr. 16, 2019) ................ *Passim*

*Terraza v. Safeway Inc.*,
No. 16-cv-03994, 2019 WL 12872959 (N.D. Cal. Mar. 27, 2019) ....................... 29

*Tibble v. Edison Int'l*,
135 S. Ct. 1823 (2015) ...................................................................................... 6, 7, 52

*Torretti v. Main Line Hosps., Inc.*,
580 F.3d 168 (3d Cir. 2009) .............................................................................. 33

*Tracey v. Massachusetts Inst. of Tech.*,
404 F. Supp. 3d 356 (D. Mass. 2019) ................................................................ 27, 50

*Trauernicht v. Genworth Fin., Inc.*,
No. 22-cv-532, 2024 WL 3996019 (E.D. Va. Aug. 29, 2024)............................ 27, 48

*In re Unisys Sav. Plan Litigation*,
74 F.3d 420 (3d Cir. 1996) .............................................................................*Passim*

*U.S. v. Mitchell*,
365 F.3d 215 (3d Cir. 2004) ............................................................................ 34, 44

*Vellali v. Yale Univ.*,
No. 16-cv-1345, 2022 WL 13684612 (D. Conn. Oct. 21, 2022) ................... 15, 20, 25

*Waldner v. Natixis Inv. Managers, L.P.*,
No. 21-cv-10273, 2024 WL 4002674 (D. Mass. Aug. 21, 2024),
*report and recommendation adopted*,
No. 21-cv-10273, 2024 WL 4134320 (D. Mass. Sept. 10, 2024) .......................... 45

**Other Sources**

The Employee Retirement Income Security Act of 1974 .................................... 1, 2, 6

**Statutes**

28 U.S.C. § 1331 ............................................................................................... 1

29 U.S.C. § 1001(a).......................................................................................... 6

29 U.S.C. § 1101(a)(1) ..................................................................................... 6

29 U.S.C. § 1104(a)(1) ..................................................................................... 7

U.S.C. § 1104(a)(1)(A) ..................................................................................... 7

29 U.S.C. § 1104(a)(1)(B)................................................................................. 5

29 U.S.C. § 1291 .............................................................................................. 1

29 U.S.C. § 1332(e)(1) ..................................................................................... 1

# I.    JURISDICTIONAL STATEMENT

## A.    The District Court's Jurisdiction

The District Court had subject matter jurisdiction over the case pursuant to 28 U.S.C. § 1331. This is a civil class action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq*.

## B.    The Court of Appeals' Jurisdiction

This Court has jurisdiction over this appeal pursuant to 29 U.S.C. § 1291 because the District Court's judgment granting Defendants' Motion for Summary Judgment is a final judgment.

## C.    Timeliness of Appeal

The District Court's Memorandum Opinion and Order was issued on June 28, 2024. JA000010 ("Order"). Plaintiffs filed the Notice of Appeal on July 26, 2024. JA003333.

## D.    Final Judgment

This appeal is from a final judgment of all parties' claims.

## E.    Statement Of Related Cases and Proceedings

This case has not been before this Court previously. To Plaintiffs' knowledge, there are currently no related cases and proceedings pending before the Court.

## II.    STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

Whether the District Court erred in holding that Plaintiffs failed to present any genuine disputes of material fact in granting Defendants' Motion for Summary Judgment. Specifically, did the District Court err in accepting Defendants' version of the record regarding: (1) the prudence of their fiduciary processes; (2) the reasonableness of the Plan's fees; and (3) the timely removal of underperforming funds. *See* JA000010 (Order, generally).

### A.    Concise Statement of the Case

Defendants breached their fiduciary duty of prudence in administering the Evonik Corporation 401(k) Savings Plan (the "Plan"), under ERISA, § 502(a)(2). Plaintiffs allege that Defendants failed to prudently manage the Plan's recordkeeping costs and failed to utilize lower cost, but otherwise identical, investment share classes under a revenue sharing fee structure that intertwines investment fees and recordkeeping fees. *See* JA000042-55 (Plaintiffs' Amended Complaint, ("Complaint")). This resulted in the Plan's participants paying avoidably excessive fees for recordkeeping and investments, which manifested in the Plan's exorbitant Total Plan Cost ("TPC"). *See* JA003243 (PSOF, ¶178).[1] The avoidably high TPC causes losses because those monies could have been reinvested rather than wasted on fees. *See* JA003239 (PSOF, ¶164); JA003243 (PSOF, ¶177); JA003237 (PSOF, ¶156).

---

[1] "PSOF" refers to Plaintiffs' Response to Defendants' Statement of Material Facts and Plaintiffs' Counter Statement of Material Facts, JA003156 (ECF No. 90).

Defendants failed to conduct negotiations and obtain the same discounts that other recordkeepers were offering. *See* JA003244 (PSOF, ¶182).

Plaintiffs also allege that Defendants imprudently maintained chronically underperforming funds, despite receiving reoccurring information in-real-time regarding the funds' underperformance. *See* JA003240-42 (PSOF, ¶¶167-174).

### B.    Procedural History

On September 28, 2023, Defendants filed their Notice of Motion for Defendants' Motion for Summary Judgment and accompanying Memorandum with exhibits. JA000072- JA003109. That same day, Defendants also filed a Notice of Motion for Defendants' Motion to Exclude Expert Testimony of Plaintiffs' Proffered Expert, Eric C. Dyson, and supporting Memorandum. *See* ECF Nos. 88, 88-1. Plaintiffs timely filed a Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (JA0003110), Responses to Defendants' Statement of Undisputed Material Facts and Counter Statement of Material Facts in Opposition to Defendants' Motion for Summary Judgment (JA0003155), and an Opposition to Defendants' Motion to Exclude Expert Testimony of Plaintiffs' Proffered Expert (ECF No. 91). Defendants then filed their replies to both oppositions on June 28, 2024. *See* JA0003248; ECF No. 93-94. On June 28, 2024, the District Court granted Defendants' Motion for Summary Judgment, but did not address the pending motion to exclude Plaintiffs' expert. *See* JA000001.

**C.    Rulings for Review**

The District Court held that Defendants indisputably adhered to the prevailing standard of prudence in reviewing the Plan's fees and investments performance, and that Defendants' actions were timely and adequately deliberated. *See* JA000006-07 (Order at 6-7); JA000008 (Order at 8); JA000009-10 (Order at 9-10). The District Court incorrectly found that "Plaintiffs' evidence, [] is based only on overall Plan fees" and ignored the evidence underlying Plaintiffs' Expert's opinions. JA000007 (Order at 7). The District Court failed to view Plaintiffs' facts holistically, especially as applied to the interrelated aspects of the Plan's high TPC, inclusive of revenue sharing issues. *Id*. The District Court found that because the Challenged Funds "had points where they exceeded their benchmarks" there was no showing of underperformance, rather than a lesser degree of loss. JA000008 (Order at 8). The District Court found that the Plan's recordkeeping fees were indisputably reasonable and justified. *Id*. The District Court failed to recognize that Defendants did not attempt to negotiate discounts in line with what other recordkeepers were offering, despite Defendants' awareness of this information. *Id*.

Lastly, the District Court held that "[b]ecause the Court finds no breach of prudence with respect to IC, the Court grants summary judgment as to Plaintiffs' [derivative] duty to monitor claim." JA000010 (Order at 10).

## III.    SCOPE OF REVIEW

### A.    Review of a Motion for Summary Judgment

On appeal, Courts "apply plenary review to the District Court's grant of summary judgment, 'applying the same standard that the lower court should have applied.'" *Le Pape v. Lower Merion Sch. Dist.*, 103 F.4th 966, 977 (3d Cir. 2024) (quoting *Chisolm v. McManimon*, 275 F.3d 315, 321 (3d Cir. 2001)). Courts "review all facts in the light most favorable to the non-moving party." *Id*. "[I]f the opponent has exceeded the 'mere scintilla' threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent." *In re Unisys Sav. Plan Litigation*, 74 F.3d 420, 433 n.10 (3d Cir. 1996). "Further, even if the facts are undisputed, summary judgment may not be granted where there is disagreement over inferences that can be reasonably drawn from those facts." *Id*. at 433. Importantly, "[e]ven where a case will be heard without a jury, the court on summary judgment does not sit as the trier of fact; it only determines whether there are issues which must be tried." *Id*.

"Given the nature of ERISA fiduciary duty cases, courts will rarely resolve them at the summary judgment stage." *Nunez v. B. Braun Medical* (*Nunez I*), No. 20-cv-04195, slip op., 2 (E.D.P.A. Apr. 21, 2023) (ECF. 112) (*see* JA003334). Cases involving ERISA's duty of prudence "must be evaluated under the reasonableness test laid out in 29 U.S.C. § 1104(a)(1)(B) [the "Prudent man standard of care"]." *Pension*

*Fund v. Omni Funding*, 731 F. Supp. 161, 169 (D.N.J. 1990). Accordingly, "[a] determination of reasonableness . . . is properly a question for the [factfinder], and is inappropriate in the summary judgment context." *Nunez I*, No. 20-cv-04195, at 2 (quoting *Pension Fund*, 731 F. Supp. at 169); *see also Board of Trs. of S. California IBEW-NECA Defined Contribution Plan v. Bank of N.Y. Mellon Corp.*, No. 09-cv-6273, 2011 WL 6130831, at *3 (S.D.N.Y. Dec. 9, 2011) (same); *Cates v. Trs. of Columbia Univ. in City of New York*, No. 16-cv-06524, 2019 WL 8955333, at *5 (S.D.N.Y. Oct. 25, 2019), *R. & R. adopted*, 2020 WL 1528124 (S.D.N.Y. Mar. 30, 2020) (ERISA claims are "ill-suited for summary judgment."). Factual interpretations and credibility assessments are crucial in ERISA bench trials. Thus, a proper evaluation of prudence requires "the benefit of live testimony and cross-examination." *Cates*, 2019 WL 8955333, at *6.

## B.    ERISA's Prudence Standard

"Congress enacted ERISA to protect 'employees and their dependents' whose 'well-being and security' was affected by 'the lack of ... adequate safeguards' for employee benefit plans." *Mator v. Wesco Distribution, Inc.*, 102 F.4th 172, 183 (3d Cir. 2024) (quoting 29 U.S.C. § 1001(a)). A fiduciary must act for the exclusive purposes of: (1) "providing benefits to participants and their beneficiaries;" and (2) "defraying reasonable expenses." 29 U.S.C. § 1104(a)(1). Reasonableness requires "the care, skill, prudence, and diligence" of a person "'acting in a like capacity and familiar with such matters.'" *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015)

6

(quoting 29 U.S.C. § 1104(a)(1)). "A fiduciary's process must bear the marks of loyalty, skill, and diligence expected of an expert in the field. [] The law expects more than good intentions." *Sweda v. Univ. of Pa.*, 923 F.3d 320, 329 (3d Cir. 2019). The Supreme Court instructs that "[i]f the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty." *Hughes v. Nw. Univ.*, 142 S. Ct. 737, 742 (2022).

Furthermore, "'[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan' [] by decreasing its immediate value, and by depriving the participant of the prospective value of funds that would have continued to grow if not taken out in fees." *Sweda*, 923 F.3d at 328 (quoting *Tibble*, 135 S.Ct. at 1826). For this reason, this Court in *Sweda* held that:

> Fiduciaries should be vigilant in "negotiation of the specific formula and methodology" by which fee payments such as "revenue sharing will be credited to the plan and paid back to the plan or to plan service providers." DOL Advisory Opinion 2013-03A, 2013 WL 3546834, at *4. Fiduciaries must also consider a plan's power ... to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has already selected.

*Sweda*, 923 F.3d at 328-29 (citation omitted).

"Whether a trustee has acted properly in selecting an investment depends upon the circumstances at the time when the investment is made and not upon subsequent events." *In re Unisys Sav. Plan Litigation*, 74 F.3d at 434. Accordingly, "the

thoroughness of a fiduciary's investigation is measured not only by the actions it took in performing it, but by the facts that an adequate evaluation would have uncovered." *Id*. at 436. This includes, "the most basic of ERISA's investment fiduciary duties, the duty to conduct an independent investigation into the merits of a particular [decision,]." *Id*. at 435.

## IV.    SUMMARY OF THE ARGUMENT

In ruling on Defendants' Motion for Summary Judgment, the District Court recognized the Parties' differing interpretation of the factual record, including questions of loss, reasonableness of fees, and standards of prudence and timeliness. The District Court did not rule on Defendants' Motion to Exclude Plaintiffs' Expert. This Appeal challenges the District Court's improper viewing of the facts in a light most favorable to Defendants despite Plaintiffs' proffered evidence.

## V.    FACTS

### A.    The Plan and the Parties

The Class Period is February 28, 2014, through the date of judgment. *See* JA003170 (PSOF, ¶25). Plaintiffs are/were participants in the Plan. *See* JA000029 (Complaint, ¶16). Evonik is the Plan sponsor. JA000030 (Complaint, ¶18). "Evonik's Board [of Directors] created the IC [Investment Committee] and delegated to it the fiduciary authority and discretion to select and monitor the Plan's investments and monitor the reasonableness of the Plan's fees." JA003173 (PSOF, ¶33). In short, the Board and the IC are Defendant-fiduciaries of the Plan.

Prudential Retirement Insurance and Annuity Company ("Prudential") was the Plan's recordkeeper during the Class Period. JA003213 (PSOF, ¶111). Prudential also managed a majority of funds in the Plan. JA000035 (Complaint, ¶45); *see also* JA003161-62 (PSOF, ¶14). Defendants engaged Fiducient as an advisor. JA003186 (PSOF, ¶¶55, 57). Fiducient gave the IC review materials and attended the IC's quarterly meetings. *Id.*

### B.    The Parties' Experts

Plaintiffs' liability and damages expert is Eric Dyson. *See* JA000141 (Revised Expert Report of Eric C. Dyson ("Dyson Rpt."), ¶5). During Dyson's 29 years of professional experience, he provided consulting services to retirement plan fiduciaries, published several works on the role of ERISA fiduciary advisors, and is currently an adjunct professor of retirement planning coursework. *See* JA000163-65 (Dyson Rpt. Appendix A, Dyson CV). Particularly relevant here is Dyson's professional experience providing "services to plan sponsors including […], acting as an adjunct plan committee member, providing ERISA fiduciary training, fiduciary best practices audit and advisor fee benchmarking services." JA000141 (Dyson Rpt., ¶5). Dyson has been an expert witness in numerous ERISA cases and for the Department of Labor ("DOL"). *Id.* (Dyson Rpt. ¶¶2-3). Dyson reached his conclusions in this case based on Plan documents, meeting minutes, materials produced by Fiducient, DOL guidance, and Dyson's professional experience. *See* JA000166-88 (Dyson Rpt., Appendix B, List of Documents Considered). Defendants' proffered experts are John Chalmers,

Steven Gissiner, and Steven Case. JA003172 (PSOF, ¶29). Dyson addresses all three of Defendants' Experts' opinions in his Rebuttal Report ("Dyson Rebuttal Rpt."), JA000193-204.

### C.     The Plan's Fee Structure

There are several ways that defined contribution plans can pay for recordkeeping fees. When fees are paid for by the participants, rather than by the sponsor, plans commonly implement either a flat per-participant fee structure or an asset-based fee that is assessed to participant accounts. *See* JA000149 (Dyson Rpt., ¶33(c)). For evaluation purposes, asset-based fees are translated into their average per-participant amounts to compare pricing to a flat-fee alternative structure. Here, Defendants opted for the Plan to use a type of asset-based fee known as revenue sharing, where payments are made by adding an extra cost to investment funds within the Plan. *See* JA000148-50 (Dyson Rpt. ¶¶31-33); *see also Mator*, 102 F.4th at 190 ("the excessiveness of the recordkeeping fees and the impropriety of offering retail-class shares are intertwined."). This means selecting the retail version of funds when there was lower cost, but otherwise identical, share classes available. *See* JA000462 (Chalmers Rpt., ¶40). ("the share classes offered in the Plan included [additional] revenue sharing [fees]"); JA000048 (Complaint, ¶85: "There is no difference between share classes other than cost—the funds hold identical investments and have the same manager."); JA000390 (Gissiner Rpt., ¶119) (same).

As discussed *infra*, Fiducient reported that the Plan's TPC was significantly higher than its benchmark group of peer plans. *See* JA000151-57 (Dyson Rpt. ¶¶41-49). Dyson concluded the Plan's high TPC was an unjustified result of the Plan's revenue sharing fee structure among other factors. *See* JA000145 (Dyson Rpt. ¶¶18-21). Furthermore, Dyson opines that Defendants' experts' analysis of investment fees after deducting the funds' revenue sharing component was a flawed approach. *See* JA000195 (Dyson Rebuttal Rpt. at ¶ 9). This is because "[t]he reality to the Plan and to participants is that revenue share is a cost imbedded in the investments provided and has an impact to the investment results experienced by the Plan participants." *Id*. Another flaw of revenue sharing is that it can lead to collecting "revenue share in excess of that required to pay for recordkeeping [which] is essentially an overcharge of fees to participants with money held in a suspense account to be potentially returned to them at some later date. This portion of plan assets that otherwise should be in control of the participant is not invested in accordance with the desires of each individual participant." JA000149 (Dyson Rpt., ¶ 33(d)). This issue does not occur with a flat-fee structure. *Id*.

### D. The Plan's TPC

Dyson opines that the Plan's high TPC was due to Defendants' selection of investments with excessive fees and failure to attempt to obtain reasonable rates for the Plan's recordkeeping fees. *See* JA000145 (Dyson Rpt., ¶¶19-21). Dyson's report incorporates Plan documents breaking down the fee categories within the TPC (*i.e.*,

investment fees, recordkeeping fees, and administrative fees). *See* JA000154-55 (Dyson Rpt., ¶¶45-47). The report shows that the investment expenses for the Plan were exactly double that of the benchmark group, 0.62% and 0.31% respectively, and that the extra share class expenses did not proportionately counter-act the recordkeeping fees. *Id*.

A 2018 fee analysis presented to the IC by Fiducient demonstrated that the Plan's cost was 0.23% higher than the benchmark group and the Plan's weighted average investment expense was 0.31% higher. JA000154 (Dyson Rpt., ¶45). Fiducient alerted the IC that the TPC was high because GoalMaker "utilizes a number of the actively managed funds" and "Passive or 'index' funds are not included in the GoalMaker models." JA000154-55 (Dyson Rpt., ¶46). A benchmark of Plan fees presented to the IC in September of 2021 demonstrated that the TPC for the Plan was 0.51%, while the benchmark of plans with similar amounts of assets under management was 0.281%. *See* JA000151 (Dyson Rpt., ¶40). In 2022, the IC was presented with an investment review that showed the TPC for the Plan was 0.42%, putting the Plan in the highest cost quartile of the benchmark, and nearly the most expensive of the plans. *See* JA000156-57 (Dyson Rpt., ¶48). Critically, Fiducient proposed implementing at least some passive index funds for GoalMaker to lower fees. JA000155 (Dyson Rpt., ¶46); *see also* JA000718 (Dyson Tr., 145:15-146:14). This was how other plans in the benchmark group managed their TPC. *Id*. Dyson opines

that this solution would have been prudent. *Id*. None of Defendants' Experts disputed the fact that Plan fees were high. *See* JA000195 (Dyson Rebuttal Rpt. ¶12).

The Plan's "GoalMaker" program served as the default investment vehicle for participants. JA000002 (Order at 2). GoalMaker's returns were compared to a benchmark "constructed by [Fiducient]" instead of an "established market index." JA000466 (Chalmers Rpt. ¶¶46-48). Dyson opines that "the performance of GoalMaker relative to its own custom benchmark should not be considered as a remedy for underperforming or high-cost funds," because "it would have had even higher returns had the investment expenses been lower, all other things being equal." JA000195-96 (Dyson Rebuttal Rpt., ¶¶13-17). Defendants could have acted to lower the TPC without eliminating GoalMaker by including one or more passive underlying funds or Target Date Funds, and/or switching to a flat-fee structure with lower cost share classes. *See* JA000194 (Dyson Rebuttal Rpt., ¶6). Plaintiffs disagree with Defendants over whether "a new [default] would have caused additional costs overall." JA003223 (PSOF, ¶128).

### E.    The Plan's Recordkeeping Fees

The Plan "could have obtained recordkeeping services that were comparable to or superior to the typical services that would have been provided by its recordkeeper" at a lower cost, and "[a] prudent fiduciary would have observed the excessive fees being paid to the recordkeeper and taken corrective action." JA000064 (Complaint, ¶130); *see also* JA000063 (Complaint, ¶126). Based on limited information before

13

discovery, Plaintiffs derived the Plan's recordkeeping fees from the Plan's publicly filed DOL Form 5500s. *See* JA003215 (PSOF, ¶115). Plaintiffs later discovered that the Plan's fees were not accurately listed in the Form 5500s, but the correct fees were nonetheless astronomical due to Defendants' imprudent processes. *Id.*

Prudent fiduciaries routinely negotiate with their current recordkeeper and prospective recordkeepers to lower fees, often by using the plan's size, investment menu, and quotes from competing recordkeepers. The Plan had several sources of leverage with Prudential, including the Plan's size and use of Prudential's proprietary investment products. JA000145-51 (Dyson Rpt., ¶¶20, 38). Fiducient conducted fee benchmarks, which can be used to superficially compare plan fees for reasonableness "within a degree," but not to the extent necessary to be certain. JA000708 (Dyson Tr., 104:22-105:6); JA000711 (Dyson Tr. 114:22-115:10). Benchmarks cannot be as effective in fee negotiations as Request for Proposals ("RFPs" or "truly competitive bids"), because benchmarks do not provide an in-depth look at a "specific plan to specific recordkeepers." JA000711 (Dyson Tr. 114:20-21).

The prevailing fiduciary standard of prudence is to conduct an RFP every three to five years. As Dyson explains, "there is no better way" to guarantee a plan gets the most competitive pricing for its size, services, and investment line ups. JA000708 (Dyson Tr. 103:6-11). Dyson's opinion does not just stem from his professional experience, but also the fact that the DOL assumes retirement plans "conduct RFPs at a minimum interval of every three to five years." JA000707 (Dyson Tr. 98:20-22); *see*

*also Mator*, 102 F.4th at 180 (reversing the dismissal of excessive recordkeeping claims where the plaintiffs alleged that "the competitive bidding process should be conducted 'at least once every three to five years.' […] Yet Wesco failed to do so."); *Vellali v. Yale Univ.*, No. 16-cv-1345, 2022 WL 13684612 *9 (D. Conn. Oct. 21, 2022) (denying summary judgment because the plaintiffs provided evidence that "the Department of Labor recommends that fiduciaries conduct a RFP or other competitive bidding process for a plan's recordkeeping fees every three to five years."). Defendants did not conduct an RFP for recordkeepers during the Class Period. *See* JA000159 (Dyson Rpt. ¶56). Conservatively, if an RFP occurred right before the Class Period, the *latest* that an RFP should have happened was 2019. Dyson opines that the "failure by the Plan fiduciaries to conduct a truly competitive bid and formal [RFP] process resulted in the Plan paying recordkeeping costs which were higher than necessary." *Id*. Dyson understands that Defendants conducted benchmarkings and one belated blind Request for Information ("RFI").

The RFI did not occur until seven years into the Class Period, in 2021. JA003221 (PSOF, ¶124). "It is important to note that a 'blind' proposal request almost always implies no opportunity for an arm's length competitive negotiation with a potential new recordkeeper" and "there would have been potential for even greater savings had" an RFP occurred. JA000157-58 (Dyson Rpt. ¶¶51, 54). Dyson opines that the 2021 RFI responses demonstrate that the Plan could have achieved lower fees and greater fee reductions earlier, especially with a "truly competitive RFP, [that likely

would] have provided for an even lower cost structure." JA000158-59 (Dyson Rpt., ¶54). The RFI's bids were only solicited to four recordkeepers, Empower, Vanguard, Fidelity, and T. Rowe Price. *See* JA003222 (PSOF ¶125). Dyson opines that Defendants failed to follow best fiduciary practices by not conducting follow-up negotiations with any of the respondents to investigate whether "they could have lowered the quotes in this fee proposal." JA000710 (Dyson Tr. 110:1-3); *see also* JA000159 (Dyson Rpt., ¶56).

The IC focused on the RFI's Tier 1 bids where quotes were based on an open architecture pricing proposal, because the IC believed an open architecture was the only way to keep GoalMaker's underlying investment menu, particularly Prudential's products. *See* JA003222 (PSOF, ¶126). Other tiers' quotes would have required the Plan to use varying amounts of that recordkeeper's proprietary products in place of Prudential's, but those bids also quoted lower recordkeeping fees (*i.e.*, a proprietary fund discount). *Id*. Dyson opined that there was no need for the Plan to eliminate GoalMaker's menu in order to achieve the same fees as the other tiers had prudent follow-up negotiations occurred. JA003223 (PSOF, ¶127). On the other hand, the Plan's high TPC was a result of GoalMaker's menu even with Prudential's proprietary products, so diligently deliberating a change was necessary. *Id*. (PSOF, ¶¶127, 128).

All four RFI respondents had lower bids than what the Plan was paying for the use of "proprietary products in a similar manner" that the Plan was using with Prudential. JA003224 (PSOF, ¶130). Hence, the proprietary discount quotes were a

more appropriate comparison to the Plan's fees and recordkeeping arrangements. *Id.*; *see also* JA000158-59 (Dyson Rpt., ¶¶54-55). However, even within the Tier 1 open architecture bids, two of four proposals were lower than what the Plan paid to Prudential. JA003225 (PSOF, ¶131). In sum, all competitors offered larger proprietary fund discounts than Prudential, and half of competitors were offering lower prices than the Plan's current fees without requiring the Plan to replace the Prudential funds. *Id.* The IC chose to retain Prudential despite this information. *Id.* (PSOF, ¶132).

Empower proposed a $23 per-participant recordkeeping fee for use of its proprietary products at the same time the Plan was paying $49.50 for using Prudential's proprietary products. JA000158-59 (Dyson Rpt., ¶¶53-55). Dyson's evaluation of the 2021 RFI responses and Plan documents revealed the recordkeeping services that Empower would provide for $23 "were not significantly different" than what the Plan already had, and the RFI respondents were similarly capable recordkeepers. *Id.* (Dyson Rpt., ¶56); JA000710 (Dyson Tr. 113:15-25; Dyson Tr. 111:1-21). Consequently, the circumstances of these quotes gave Defendants, "additional leverage to negotiate recordkeeping fees that were below average and below median." JA000145 (Dyson Rpt., ¶20). Had the data from the 2021 RFI been leveraged appropriately, the Plan could have achieved recordkeeping fees below $23 in 2021. *See* JA000158-59 (Dyson Rpt., ¶54); JA000709 (Dyson Deposition Tr. at 109:21-110:3). Dyson opines that without a truly competitive RFP, Empower's $23 quote "is the only information specific to this plan available throughout the class

17

period" to base his fee point dollar amount opinion on, but other Plan information shows prudent processes would have resulted in significant fee reductions earlier in the Class Period. JA000711 (Dyson Tr. 114:7-10); *see also* JA000158-59 (Dyson Rpt., ¶¶54-56).

Since the beginning of the Class Period the recordkeeping fees were as follows:

| Plan Year | RK Cost |
|-----------|---------|
| 2014 | $116 |
| 2015 | $110 |
| 2016 | $106 |
| 2017 | $95 |
| 2018 | $65 |
| 2019 | $65 |
| 2020 | $65 |
| 2021 | $49.50 |
| 2022 | $49.50 |

*See* JA000158 (Dyson Rpt. ¶53).

Dyson opines that the fee decreases the Plan experienced were not enough to bring the Plan's recordkeeping fees in line with reasonable rates, and if Defendants followed prudent negotiation and bidding processes, the Plan could have achieved lower rates than the decreases the Plan experienced without these processes. *See* JA000158-59 (Dyson Rpt., ¶¶52-56). At certain points, the fees decreased as a result of the increase in Plan assets, which would have occurred without negotiations. *See* JA003221 (PSOF, ¶123, Plaintiffs' dispute of Defendants' fact, citing the 2022 Quarter 1 Investment Report). Defendants argue that the decreases were the result of benchmarking negotiations, but as Dyson opines, benchmarks are relatively ineffective negotiation tools compared to RFPs. *See* JA003243 (PSOF, ¶180).

18

### F.    The Plan's Underperforming Funds

Apart from not acting on the high TPC and fee data provided by Fiducient, Defendants failed to adhere to the prevailing standard of prudence in evaluating the Plan's funds' performance. The institutional share class versions of the Plan's funds automatically have higher returns than their retail version counterparts, because the returns are net-of-fees. *See* JA000196-200 (Dyson Rebuttal Rpt. Sections V.A and V.B.); *see also* JA000697 (Dyson Tr. 58:14-59:6). Similarly, on both a pre-fee and net-of fee basis, actively managed funds on average perform worse than passive indexes in the same category. JA000150 (Dyson Rpt., ¶36 (citing data from the S&P Dow Jones Indices)).

Dyson opines on two specific funds' performance without considering fees: the Fort Washington Large Cap Core Fund ("Fort Washington") and the Artisan Partners International Growth Fund ("Artisan") (the "Challenged Funds"). *See* JA000160 (Dyson Rpt. ¶59). Dyson opines that the IC was aware the Challenged Funds repeatedly fell short of passive benchmark performance in their respective categories, including in 2015 and the three-year and five-year marks. *Id.*; *see also* JA000703 (Dyson Tr. 82: 14-24).

Defendants' imprudent processes enabled the Challenged Funds' overlong inclusion in the Plan. Dyson testified that the quarterly reports did not show specific funds "compared to any benchmark" and "there's no peer-group analysis" for Modern Portfolio Theory ("MPT") factors. JA000704 (Dyson Tr. 86:24-88:13). Courts have

held MPT is the fiduciary standard for reviewing investments and portfolios. *See Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 380 (4th Cir. 2014) (MPT "has been adopted both by the investment community and by the Department of Labor in its implementing regulations for ERISA."); *Laborers Nat. Pension v. Nor. Trust Advisors*, 173 F.3d 313, 322 (5th Cir. 1999) (the "only expert witness who properly assessed [the] investments" used "modern portfolio ERISA principles" and looked at the challenged fund's quarterly reports).

Dyson analyzed the IC meeting minutes and Plan documents in opining that: (1) the Plan's vague Investment Policy Statements ("IPS") impaired the IC's ability to monitor investments; (2) Defendants repeatedly "failed to act on [the Plan's] available information to ensure that costs were reasonable;" and (3) the IC could not have effectively monitored performance benchmarks for the Plan's funds. *See* JA000151, JA000159-60 (Dyson Rpt. ¶¶40, 57-59). The report of Defense Expert Dr. Chalmers shows the annualized cumulative return for the Challenged Funds experienced lower annualized cumulative returns compared to their peer group medians and benchmarks. JA000202 (Dyson Rebuttal Rpt. ¶¶27, 28).

ERISA experts, like Dyson, opine that "it is an accepted practice in the industry to have an investment policy statement to guide investment review[,]" separate from engaging advisors. *Vellali v. Yale Univ.*, No. 16-cv-1345, 2022 WL 13684612, at *19 (D. Conn. Oct. 21, 2022); *see also* JA000151 (Dyson Rpt., ¶57). Under ERISA, fiduciaries must "comply with the written documents serv[ing] to protect the

participants and the beneficiaries." *Dardaganis v. Grace Cap. Inc.*, 889 F.2d 1237, 1241 (2d Cir. 1989). For these reasons, prudent IPSs are written to provide a degree of specificity and guidance so that the IPS can be understood and properly implemented. *See* JA000159 (Dyson Rpt., ¶57).

None of the Plan's IPSs met fiduciary standards, because the IPSs "provided very little specific criteria on how to select and monitor plan investments" or MPT factors. JA000159-60 (Dyson Rpt., ¶¶57, 58); JA000201 (Dyson Rebuttal Rpt., ¶24). The IPSs only had general principles. *Id*. Specifically, Dyson opines the IPS was too "vague" to use in "operating with a fiduciary standard of care[,]" and "it is difficult to determine what if any criteria from the IPS were used by The Plan fiduciaries to select Plan investment options and which benchmarks were appropriate for comparison." JA000160 (Dyson Rpt., ¶58); *see also*, JA000145-46 (Dyson Rpt., ¶23); JA000194, JA000201 (Dyson Rebuttal Rpt. ¶¶7, 23-24); JA000702-03 (Dyson Tr. 81:23-25; 84:19-85:19). For example, there was no specific period over which performance will be used to select and monitor performance. *See* JA003240 (PSOF, ¶168, summarizing Dyson's opinions and testimony). Dyson explained "[t]his is normally outlined in an IPS." *Id*. However, here the IPS's "Benchmarks are not specified nor are risk adjusted return measures. As a result, it is difficult to determine what if any criteria from the IPS were used by The Plan fiduciaries to select Plan investment options and which benchmarks were appropriate for comparison." JA000160 (Dyson Rpt., ¶58). Dyson additionally opines that, "fiduciaries must have a robust process in place to provide an

indication that the additional costs of active management over passive management is justified with the expectation of higher returns." *Id*. (Dyson Rpt. ¶59). As such the IPSs were missing "sufficient criteria to determine if actively managed funds were suitable and prudent to be included in the plan when compared to a passive benchmark." JA000145-46 (Dyson Rpt., ¶23). The Parties dispute as to whether the watchlist produced by Fiducient was in any way tied to the IPS. Neither the deposition testimony nor the watchlist cited by Defendants mentions the IPS. JA003192-93 (PSOF, ¶67, disputing Defendants' fact). In fact, IC member testimony confirms that funds were placed on the watchlist because of Fiducient's opinion. *Id*. (citing Cherkis J, 138:9-12).

### 1.    Artisan Fund

Dyson opines that the Artisan Fund should have been removed as early as 2015 based on Plan documents showing losses, and after 2015 the fund "fell below its three- and five-year performance" on multiple occasions. *See* JA000703 (Dyson Tr. 82: 14-24). During the Class Period, the Artisan Fund had an annualized cumulative return of 5.61% compared to the peer groups median of 8.15% and compared to the benchmark return of 7.54%. JA000202 (Dyson Rebuttal Rpt. ¶ 27, referencing Defense Expert Chalmers' Report Exhibits 11 – 14). The annualized cumulative return for the Artisan Fund during the Class Period was in the 89th percentile of peer funds. *Id*.

Exhibit 5A of the report of Defendants' expert Case confirms that Defendants employed imprudent processes, and the Artisan Fund had chronic underperformance.

JA000270-81 (Case Rpt., Exhibit 5A). Out of thirty quarterly meetings, the review materials stated that the Artisan Fund underperformed its benchmark twenty times. *Id*. At three separate times, the materials by Fiducient stated the underperformance was due to "Poor stock selection[,]" providing a qualitative criticism of the funds' management. *Id*. Between the first quarter of 2015 through the first quarter of 2017, the Artisan Fund only outperformed its benchmark one time in eight quarters, but there are no meeting minute discussions addressing the fund's poor performance. *Id*. The IC failed to inquire about the Artisan Fund's continuous "maintain status[,]" poor performance, and poor stock selection, until the first quarter of 2017. *Id*. The IC never asked again following this belated, isolated commentary. *Id*. Four years later, after continued underperformance, the IC had an off-cycle meeting because Fiducient said the fund should be listed as "discuss" on the watchlist. JA000280 (Chalmers Rpt, Exhibit 5A at 11). While IC members may have testified in their deposition that the IC considered these reports, the meeting minutes and record demonstrate that they did not. *See* JA003190-91, JA003194-95 (PSOF disputing Defendants facts ¶¶63, 64, 70, 71).

## 2. Fort Washington Fund

During the Class Period the Fort Washington Fund had an annualized cumulative return of 8.58% compared to the peer group median of 9.56% and compared to the benchmark return of 10.88%. JA000202 (Dyson Rebuttal Rpt., ¶28, referencing Chalmers Report Exhibits 11 – 14). The annualized cumulative return for

the Fort Washington Fund was in the 64th percentile of peer funds. Exhibit 5B of the report of Defendants' expert Case demonstrates Defendants' imprudent processes and the Fort Washington Fund's chronic underperformance. *See* JA000282-87. The Fund spent half of 2014 underperforming, with no evidence of IC discussions for the entire year. *See* JA000284 (Case Rpt., Ex. 5B at 15). There are five instances between the fourth quarter of 2016 through the second quarter of 2018 where the Fiducient report states "Commentary not available[,]" but there was only one instance where the IC discussed the Fort Washington Fund, in the first quarter of 2017, where someone (possibly Fiducient) said they "will need to research." JA000284-85 (Case Rpt., Ex. 5B at 15-16). Meaning, there are five quarters where no information was provided to the IC, and only one instance of questioning the Fund's circumstances. After this period of non-information, the Fort Washington Fund underperformed for five quarters in a row (from the third quarter of 2018 through the third quarter of 2019) before being removed. JA000285-JA000287 (Case Rpt., Ex. 5B at 16-18). After the first three quarters of this underperformance period, Fiducient said the "performance results could be isolated to the 4th quarter" and that nothing triggered putting the fund on a watchlist. JA000286 (Case Rpt., Ex. 5B at 17). The commentary from the second quarter of 2019 meeting indicates that the fund was underperforming since long enough before June 30,2018 to be placed on the watchlist, which would include the period of no-commentary. *See* JA000287 (Case Rpt., Ex. 5B at 18). Thus, Fiducient's characterization of underperformance as an isolated event was demonstrably untrue.

Both Fiducient's mischaracterization and the Fort Washington Fund's underperformance went uninvestigated.

Dyson testified that the Fort Washington Fund's history was not consistent with the IPS, that the IPS was "vague," and that the fund should have been removed sooner. JA000695 (Dyson Tr. 52:14-24). Dyson's damages span from 2015 to 2018 and accounts for the sparse periods of better performance. *See* JA000191 (Dyson Rpt. Appendix C, Damages Calculations). Per Dyson's report, the Plan underperformed its benchmark for three out of four years, with the Fund only outperforming the benchmark by .2% in 2017. *Id*. Dyson's damages amount is conservative because it does not include the Class Period year of 2014 where the Fund underperformed without investigation. *Id*.

## VI.   ARGUMENT

### A.   Expert Opinions Create Genuine Disputes

The District Court stated that "Plaintiffs' claim that Defendants breached their duty of prudence relies primarily on their expert[,]" but did not rule on Defendants' motion to exclude Dyson. JA000003 (Order at 3). Importantly, Dyson reached his conclusion based partially on Plan documents, meeting minutes, and materials produced by Fiducient. *See* JA000141-61 (Dyson Rpt., generally). Hence, Dyson's opinions are a culmination of the same information Defendants received and/or documented regarding the Plan. *See Vellali*, 2022 WL 13684612, at *21 (a material factual dispute precluded summary judgment where the plaintiffs' expert "obtained

benchmarks from the same sources used by Defendants' expert and investment advisor"). Dyson's report includes screenshots from the Plan's materials. *See* JA000157-57 (Dyson Rpt., ¶¶41-48). There are instances where the Parties' experts agree, and many areas where the experts interpret the same data differently, and Dyson refutes many of Defendants' experts' key arguments in his rebuttal report. Thus, "summary judgment is inappropriate" here, "where issues of material fact are disputed by experts." *Ford v. Panasonic Corp. of N. Am.*, 284 F. App'x 901, 903 (3d Cir., 2008); *see also In re Unisys Sav. Plan Litigation*, 74 F.3d at 437 ("Mr. Gottheimer's opinion, based on his interpretation of the deposition testimony and exhibits he reviewed, is itself some evidence of Unisys' imprudence, capable of defeating Unisys' motion for summary judgment.").

Expert opinion precludes summary judgment in ERISA breach of fiduciary duty cases in virtually every Circuit. *See*, *e.g.*, *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 305 (5th Cir. 2000) ("the record also contains statements from Appellants' experts, three of whom had acted as a fiduciary, that RJR's practices breached its fiduciary duties. Given this case is before us on summary judgment, we leave to the factfinder the task of making credibility assessments."); *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 798 (7th Cir. 2011) (reversing the grant of summary judgment in part because the plaintiffs' expert, "who has expertise in the area of retirement-plan recordkeeping services[,] reviewed the process that defendants followed when they extended Hewitt's contract and opined that defendants acted imprudently by extending

the contract without first soliciting bids from other recordkeepers [and what] a reasonable fee for the kind of recordkeeping services the Plan needed would have been."); *Tracey v. Massachusetts Inst. of Tech.*, 404 F. Supp. 3d 356, 362–63 (D. Mass. 2019) (similar); *Mills v. Molina Healthcare, Inc.*, 694 F. Supp. 3d 1272, 1286 (C.D. Cal. 2023) (although the defendants' expert report showed prudence, "Plaintiffs produce competing expert reports plausibly opining that the investments were imprudent for numerous reasons."); *Scalia v. Reliance Tr. Co.*, No. 17-cv-4540, 2021 WL 795270, at *28 (D. Minn. Mar. 2, 2021) ("in the face of conflicting expert testimony on the duty of prudence in this case, disputed issues of material fact preclude the entry of summary judgment."); *Cates*, 2019 WL 8955333, at *11 (the plaintiffs' experts' opinions meant that "[a]t the summary judgment stage, it is sufficient that Plaintiffs have adduced some evidence that Columbia breached its duty with respect to recordkeeping fees and the alleged breaches caused a loss to the Plans."); *Davis v. Magna Int'l of Am., Inc.*, No. 20-11060, 2023 WL 3821807, at *5 (E.D. Mich. June 5, 2023) (denying summary judgment because, although the defendant showed evidence of independent advisor reports and processes, "[i]n response, Plaintiffs point out that Expert Dyson in his report 'details several reasons why the Plan's TDF suite is imprudent [….'] Dyson opined that a failure to understand revenue sharing arrangements resulted in 'investment options in the Plan being evaluated based on criteria which was not in the best interest of the Plan participants.'"); *Trauernicht v. Genworth Fin., Inc.*, No. 22-cv-532, 2024 WL 3996019, at *4 (E.D. Va. Aug. 29,

2024) (the defendants' evidence "must be weighed against Plaintiffs' evidence and expert testimony applying this Plan's IPS to the facts of the case. That weighing of evidence is not appropriate at the summary judgment stage."). As discussed next, there are many more cases where the plaintiff's expert opined on allegations materially similar to the instant case, thereby precluding summary judgment.

In virtually all ERISA cases the defendant-fiduciaries undertook some processes for monitoring fees, including this case. Nevertheless, courts routinely hold that meeting minutes, advisors, and even conducting some superficial level of review did not justify summary judgment, particularly when the plaintiffs' expert opines these processes were either imprudently carried out or otherwise insufficient. *See, e.g.*, *In re Unisys Sav. Plan Litigation*, 74 F.3d at 430 (holding meetings, reviewing materials, conducting product bids, and engaging consultants did not justify granting summary judgment); *Davis*, 2023 WL 3821807, at *7 (holding that despite the defendants' quarterly reviews with an investment advisor there were still genuine issues of material fact regarding the fiduciary's investment review processes); *McCool v. AHS Mgmt. Co.*, Inc., No. 19-cv-01158, 2023 WL 2752400, at *3 (M.D. Tenn. Mar. 31, 2023) (evidence of quarterly meetings did not equal an "absence of evidence to support Plaintiffs' claims, as required to shift the burden to Plaintiffs as the nonmoving party"); *In Re Omnicom Group Inc. ERISA Litigation*, No. 20-cv-4141, 2022 WL 18674830, at *16 (S.D.N.Y Dec. 23, 2022) (denying defendants' motion for summary judgment under similar circumstances); *Feinberg v. T. Rowe Price Group, Inc.*, No. 17-cv-

427, 2021 WL 488631, at *8 (D. Md. Feb. 10, 2021) ("though the evidence shows the Trustees engaged in a legitimate oversight process and that the Plan's assets tripled under their stewardship, it would be premature to find that their conduct was loyal and prudent in all instances as a matter of law."); *Terraza v. Safeway Inc.,* No. 16-cv-03994, 2019 WL 12872959, at *3 (N.D. Cal. Mar. 27, 2019) (denying the parties' cross motions for summary judgment in separate opinions where special off-cycle investment meetings occurred).

Indeed, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not . . . suffice in every case to demonstrate prudence." *Sacerdote v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021). This is because "[d]eliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Id*. (quoting *Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 720 (2d Cir. 2013) (emphasis in original).

As relevant here, a number of Dyson's opinions and interpretations were improperly disregarded, discredited, or mischaracterized in Defendants' favor by the District Court. *See In re Unisys Sav. Plan Litigation*, 74 F.3d at 437; *see also Armano v. Martin*, 703 F. App'x 111, 112 (3d Cir. 2017) ("In reviewing a motion for summary judgment, we view the evidence in the light most favorable to the non-moving party.

We refrain from making credibility determinations or weighing the evidence."). As discussed *infra*, ERISA law instructs, even without considering expert opinions, that these factual disputes are genuine and material, thereby precluding summary judgment.

## B.    Recordkeeping Fee Disputes

Regarding the Plan's recordkeeping fees, the District Court accepted Defendants' version of events as to: (1) why the Plan's TPC was higher than its peers; (2) why it was acceptable not to negotiate fees and/or conduct truly competitive bidding; (3) the recordkeeping fees were justified and reasonable; and (4) that Defendants reliance on Fiducient's advice was prudent. Further, the District Court ignored that Dyson opined that the proprietary funds in the Plan should have led to further decreases in recordkeeping fees as corroborated by the RFI responses, and Dyson's debunking of the "net of revenue sharing" fee analysis used by Defendants. JA003243 (PSOF, ¶177). In similar allegations, the court in *Davis v. Magna Int'l of Am., Inc.* denied summary judgment because "Dyson opined that a failure to understand revenue sharing arrangements resulted in 'investment options in the Plan being evaluated based on criteria which was not in the best interest of the Plan participants.'" *Davis*, 2023 WL 3821807, at *5. The same is true here.

Regarding the 2021 RFI process, the District Court weighed in favor of Defendants' reasoning that the IC "did *consider* [the] lower costs offered in the same tier by certain providers—but decided to remain with its recordkeeper because it felt

that 'the *minimal* cost savings that could have been achieved ... would have been offset by the risk of error ... and disruption to Evonik.'" JA000009 (Order at 9; emphasis added). This finding was erroneous in several ways. First, the Opinion cites Defendants' Statement of Facts based on committee member affidavits, but in Plaintiffs' statement of facts they dispute Defendants' paragraphs by providing Dyson's testimony refuting that the IC prudently followed up on the responses and debunking that the Plan's only options were to stay with Prudential at the current rate or switch to an open architecture plan with another recordkeeper. JA003225-26 (PSOF, ¶¶132, 133); *Cates*, 2019 WL 8955333, at *9 ("Plaintiffs cite evidence that, once Columbia conducted an RFI [the recordkeepers lowered their fees] Plaintiffs contend that Columbia could have achieved similar savings by conducting competitive bidding sooner."). Meaning, Dyson opined that adhering to the prevailing standard of care in negotiations would have resulted in more than a minimal reduction in fees without moving to a new provider and/or changing GoalMaker's menu. Second, considering an option, even in depth (which was not the case here), is not the same as negotiating or investigating all viable options. Thus, the IC's meeting discussion does not conclusively prove prudence. Relatedly, the District Court acknowledged that within the open-architecture tier of services, "two [of four] providers offered lower than the Plan's fees," but accepted Defendants' reason for not selecting these providers or negotiating with Prudential to match their competition's rates. JA000004 (Order at 4n.4).

Third, subsequent rounds of negotiations using lower bids has been shown to be both a factual reality and, correspondingly, a genuine dispute as to prudent processes. In fact, the District Court repeatedly cites to the post-trial decision in *Nunez v. B. Braun Med., Inc.* (*Nunez II*), where "The Committee also regularly utilized third-party consultants to benchmark the Plan's recordkeeping fees, only one of which concluded that the Plan's fees were higher than usual, which itself *resulted in the Committees negotiating* a reduction in fees." *Nunez II*, No. 20-cv-4195, 2023 WL 5339620, at *12 (E.D. Pa. Aug. 18, 2023) (emphasis added); *see also Bussian*, 223 F.3d at 307 ("A reasonable factfinder could conclude that an appropriate investigation would have revealed this information and that such information, when weighed against the information that should have been gathered on other providers, would cause a fiduciary to eliminate Executive Life as a final candidate."). Of course, the factual finding in *Nunez II* was appropriately saved for trial, where the parties' experts and fact witnesses testified live and were cross examined. *See Nunez I,* No. 20-cv-04195 at 2 (denying summary judgment because "whether the Committee behaved prudently in deciding to use revenue sharing to pay recordkeeping costs up until 2019" and "whether the Committee failed to look into and consider cheaper recordkeeping fee options" were material factual disputes.). Evaluating the record and opinions at trial is crucial in ERISA cases. *See Cates*, 2019 WL 8955333, at *6 ("When the fact-finder is the court, expert evidence should be quite freely admitted so that the judge may have the benefit of live testimony and cross-examination to determine how much weight, if any, to give

to the expert's conclusions."); *Reetz v. Lowe's Companies, Inc.*, No. 18-cv-00075, 2021 WL 535160, at *2 (W.D.N.C. Feb. 12, 2021) (similar).

Lastly, the District Court erroneously held that Dyson's opinion was "too speculative to pose a triable issue of fact." JA000009 (Order at 9). The District Court relied on two cases, neither of which were ERISA cases nor involved expert opinions. First, the court cited *Torretti v. Main Line Hosps., Inc.*, 580 F.3d 168, 179 n.16 (3d Cir. 2009), but the speculation in that case came from a medical patient overhearing what she incorrectly assumed was "her biophysical profile score, though she did not state any reasons for this belief." *Torretti*, 580 F.3d at 179 n.16. Then the District Court cited *Ramara, Inc. v. Westfield Ins. Co.*, 814 F.3d 660, 666 (3d Cir. 2016), but that quote was simply reiterating the general summary judgment standard. Dyson's opinions are more than speculation and the facts of other cases corroborate that other experts share the same opinions on fiduciary prudence.

## C.   TPC Disputes

### 1.   Dyson's Multifaceted Analysis

The Supreme Court instructs that courts must regard the "context-specific inquiry that ERISA requires" and "[]evaluate the allegations as a whole […] [b]ecause the content of the duty of prudence turns on 'the circumstances ... prevailing' at the time the fiduciary acts." *Hughes*, 142 S. Ct. at 740, 742; *see also Mator*, 102 F.4th at 189-90. Dyson's TPC opinions are multifaceted, but the District Court selectively considered only that Dyson noted there were recordkeeping fees, revenue sharing and

actively managed funds contributing to the TPC, rather than recognizing Dyson's opinions as to *why* these avoidable factors did not excuse the high TPC. *See* JA000003 (Order at 3). However, in "clarifying the prudent person standard, ERISA's implementing regulations require that the fiduciary give 'appropriate consideration' to whether an investment 'is reasonably designed, as part of the portfolio ... to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment [.]'" *Hugler v. Byrnes*, 247 F. Supp. 3d 223, 232 (N.D.N.Y. 2017) (quoting 29 C.F.R. § 2550.404a–1(b)(2)(i)); *see also Harley v. Minnesota Mining & Mfg. Co.*, 42 F. Supp. 2d 898, 909 (D. Minn. 1999), *aff'd sub nom. Harley v. Minnesota Min. & Mfg. Co.*, 284 F.3d 901 (8th Cir. 2002) ("it is important to look at the structure of the entire portfolio to determine whether stated objectives with regard to a particular investment are sound."). Hence, the District Court incorrectly held that "Plaintiffs cannot create a fact issue on prudence by evaluating fees for the entire Plan, as opposed to a specific fund." JA000007 (Order at 7). Because the Plan's recordkeeping expenses are paid for by Plan assets, and investment portfolios consider fees alongside performance, the TPC is akin to a portfolio. As explained in *Bell v. Pension Comm. of ATH Holding Co., LLC*:

> Plaintiffs also cite the report of an expert opining that investment committees have a fiduciary duty to consider the expenses paid by the plan when determining how to invest. Plaintiffs' designated evidence is sufficient to raise a question of fact as to

> whether the Defendants breached their fiduciary duty by failing to negotiate recordkeeping fees.

*Bell*, No. 115-cv-02062, 2019 WL 387214, at *8 (S.D. Ind. Jan. 30, 2019).

Dyson opines that participants' investment gains are undermined by excessive recordkeeping fees and the investment fees of both the Plan's retail share classes and actively managed funds. Absent from the District Court's improper fact finding is the material fact that it was not just Dyson's opinion to lower fees by using at least one passive fund in GoalMaker, but also Fiducient's proposed solution. *See* JA000154 (Dyson Rpt., ¶46). Dyson further opines that replacing some of the active funds with passive funds will also likely result in better returns. *See* JA000195-97 (Dyson Rebuttal Rpt., ¶¶13-17); *see also* JA000151, JA000159 (Dyson Rpt., ¶¶36, 57). The benchmark analysis shows that including passively managed funds is the prevailing standard of prudence.

The District Court noted, and Dyson opines, that the lower cost versions of the revenue sharing funds are identical except for the additional cost. *See* JA000003 (Order at 3). The District Court improperly assumed, in preferring Defendants' version of the record and ignoring contrary evidence, that the TPC was unproblematic because "Defendants used revenue sharing to lower the Plan's total net cost," and because actively managed funds are permissible. JA000007 (Order at 7). The District Court also ignored Dyson's criticism that revenue sharing is imprudent because, even if eventually rebated, the excess monies collected are held separately from participants'

accounts and participants' investment directives. *See* JA000149 (Dyson Rpt., ¶33(d)). This is one reason why most plans do not use revenue sharing. *Id*. Dyson's testimony is of the type commonly found to create genuine disputes about the prudence of using a revenue sharing fee structure. *See*, *e.g.*, *Miguel v. Salesforce.com, Inc.*, 20-cv-01753, 2024 WL 1222092, at *3 (N.D. Cal. Mar. 20, 2024) ("Plaintiffs, however, have submitted testimony from their expert [] that the revenue sharing paid by the R6 class does not directly offset the expense ratio."); *Davis*, 2023 WL 3821807, at *5.

The District Court criticized Dyson for not using a "a fund-specific analysis" to evaluate fees within the TPC, because comparator fees must have "strategies, objectives, or risk profiles similar of that of the plan's funds." JA000007 (Order at 7). The District Court cites the out-of-circuit and materially distinguishable motion to dismiss case in *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136 (10th Cir. 2023). However, unlike the allegations in *Matney*, the differing share classes of the same funds here would not have "separate goals and separate risk profiles." JA000007 (Order at 7). The only difference was lower fees that would have led to a lower TPC (especially when accompanied by lower recordkeeping fees). *See Mator*, 102 F.4th at 182 ("Mutual funds offer multiple classes of shares that are identical in every way except cost."); *Sweda*, 923 F.3d at 328-29; JA000390 (Gissiner Rpt., ¶119); JA000462 (Chalmers Rpt., ¶40); JA000248-49 (Case Rpt. ¶84(d)); JA00016061 (Dyson Rpt., ¶61).

The District Court improperly discredited Dyson's TPC analysis by citing the motion to dismiss decision in *McCaffree Fin. Corp. v. ADP, Inc.*, No. 20-cv-205492, 2023 WL 2728787 (D.N.J. Mar. 31, 2023). *McCafferee* actually held that "[t]he Court cannot rule out the possibility that McCaffree might plausibly allege that Defendants subjected the Plan to excessive recordkeeping/administrative costs and excessive total plan costs." *McCaffree*, 2023 WL 2728787, at *16. Moreover, Dyson's report and Fiducient's documents provide the "additional context beyond their allegation that the Plan's total plan cost was high[]," that the court found lacking in *McCafferee*. *Id.* at *15[2]; *see also Mator*, 102 F.4th at 190 ("the excessiveness of the recordkeeping fees and the impropriety of offering retail-class shares are intertwined. But, as explained above, the excessive-fee claim is adequately pled. […] [the revenue-sharing] benefit was not realized here."). The TPC was higher than necessary, and higher than the benchmark, because of Defendants' imprudent choices. Relevant here is the Third Circuit holding in *Graden v. Conexant*:

> In determining what the Plan would have earned had the funds been available for other Plan purposes, the district court should presume that the funds would have been treated like other funds being invested during the same period in proper transactions. Where several alternative investment strategies were equally

---

[2] At the motion to dismiss stage, many other courts have held a high TPC is indicative of imprudent processes. *See*, *e.g.*, *Velazquez v. Mass. Fin. Servs. Co.*, 320 F. Supp. 3d 252, 256 (D. Mass. 2018); *Garnick v. Wake Forest Univ. Baptist Med. Ctr.*, 629 F. Supp. 3d 352, 366 (M.D.N.C. 2022); *Allison v. Brands, Inc.*, No. 20-cv-6018, 2021 WL 4224729 at *9, (S.D. Ohio Sept. 16, 2021).

> plausible, the court should presume that the funds would have
> been used in the most profitable of these.

*Graden*, 496 F.3d 291, 301 (3d Cir. 2007).

Here, the TPC benchmarks demonstrate what the Plan "would have earned had" Defendants executed plausible "alternative investment strategies." *Id*. The First Circuit has adopted *Graden*'s holding that "[l]osses to a plan from breaches of the duty of prudence may be ascertained, with the help of expert analysis, by comparing the performance of the imprudent investments with the performance of a prudently invested *portfolio*." *Evans v. Akers*, 534 F.3d 65, 74 (1st Cir. 2008) (citing *Graden*, 496 F.3d at 301 (emphasis added)). Comparing the TPC of the Plan with peer plans that also have the same composition of underlying fee categories is appropriate for opining on loss.

As this Court has recognized, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means" to discredit expert opinion. *U.S. v. Mitchell*, 365 F.3d 215, 245 (3d Cir. 2004). Here, the District Court improperly weighed and discredited Dyson's use of TPC data to measure losses. Directly on point is the First Circuit's holding in *Brotherston v. Putnam Invs., LLC*, 907 F.3d 17 (1st Cir. 2018). The First Circuit partially reversed the district court's grant of summary judgment for the defendants, when, like here, parts of the challenged portfolio were deemed prudent. The court held that "the presence of prudently managed [] funds in the Plan's investment menu

suggests that a portion of [the expert's] estimate of total portfolio-wide loss may be subject to challenge." *Brotherston*, 907 F.3d at 33-34. However, the expert's method was not "inadequate as a matter of law." *Id*. The district court explained that whether the expert "necessarily picked suitable benchmarks, or calculated the returns correctly […] are questions of fact[,]" but the approach of estimating total portfolio-wide losses was acceptable. *Id*. at 34; *see also Alco Industries, Inc. v. Wachovia Corp.*, 527 F. Supp. 2d 399, 407 (E.D. Pa. 2007) (approving the methodology that "compares the performance of the actual portfolio against that of a benchmark portfolio to determine the difference. Making this calculation appears within the professional expertise of accountants.").

The District Court acknowledged that recordkeeping fees and administrative fees were included in the TPC, but ignored Dyson's intertwined opinion that the recordkeeping fees were also excessive and all plans in the comparisons used investment, administrative, and recordkeeping fees. *See Mator*, 102 F.4th at 190. The portion of the peer plans' and the Plan's TPC attributable to administrative fees is irrelevant and neutral among plans. Defendants did not argue that the Plan's administrative fees were the reason why the TPC was consistently higher than its peers, nor would that justify summary judgment. Based on the Plan's documents and Fiducient commentary, Dyson opines that excessive investment management fees and excessive recordkeeping fees drove up costs, so lowering costs in line with the peer plans would only require action regarding investment and recordkeeping fees. In fact,

Dyson's report incorporates Fiducient's breakdown of the fee categories within the TPC, showing that the investment expenses for the Plan were exactly double that of the benchmark group, which did not proportionately counter-act the excessive recordkeeping fees. *See* JA000154 (Dyson Rpt., ¶45).

## 2.    Actively Managed Versus Passively Managed Funds

The District Court accepted Defendants' argument that the Plan's "offer[ing] [of only] actively managed funds through GoalMaker" was a self-evident justification for the high TPC. JA000007 (Order at 7). The District Court ignored the section of Dyson's report opining that Fiducient proposed including passively managed funds to lower costs, and that the IC failed to follow the fiduciary standard of care which is to investigate whether "the additional costs of active management over passive management is justified with the expectation of higher returns." JA000159-60 (Dyson Rpt., ¶¶57-59); *see also Hugler*, 247 F. Supp. 3d at 232. For example, the IPS did not offer "sufficient criteria" to ensure the actively managed funds were cost-effective, and the IC should have used an appropriate benchmark, like other plans. JA000145-46 (Dyson Rpt. ¶23).

In holding that Dyson's losses were incorrect, the District Court disregarded Dyson's first, conservative damages scenario that did not require changing the active default to a passive default. *See* JA000153 (Dyson Rpt. ¶43). Nonetheless, Dyson's second scenario is sourced by Fiducient data that compares the Plan to portfolios of plans using a passive default. *Id*. Similarly, in *Brotherston* the plaintiffs' expert

doubted "whether the Plan got something for those higher [actively managed] fees[,]" and analyzed "passive comparators" to demonstrate that the actively managed default funds were imprudent. *Brotherston*, 907 F.3d at 32. The First Circuit held that it was acceptable for the expert to compare portfolios and testify that "the Plan and its beneficiaries paid a premium [] to obtain overall net returns that fell below the returns generated by the passive investment options." *Id*. at 33.

Rather than acknowledge the in-depth discovery in this case or summary judgment cases, the District Court relied on the out-of-circuit motion to dismiss opinion in *Smith v. CommonSpirit Health*, 37 F.4th 1160 (6th Cir. 2022) to reason that "[o]ffering actively managed funds is not in itself imprudent." JA000007 (Order at 7, citing *Smith*, 37 F.4th at 1163). But, including actively managed funds can be imprudent in terms of both fees and process, especially here where GoalMaker, the default option, included ***only*** actively managed funds. Thus, *Smith* is unhelpful in the context of this case and the record developed. *See Klawonn v. Bd. of Directors for the Motion Picture Indus. Pension Plans*, No. 22-cv-209194, 2022 WL 17224708, at *4 (C.D. Cal. Sept. 27, 2022) ("Defendant argues that a comparison with passively managed funds is inapposite; but the point of the comparison is that Defendants *should have* used lower cost, passively managed funds."). Dyson's report properly links Defendants' poor review processes to the Plan's excessive investment fees.

### D. Other Disputes Precluding Summary Judgment

### 1.    The Plan's Investments

The Court improperly held that the IC had an indisputably prudent process, because:

> Fatal to Plaintiffs' claims is that IC utilized a prudent process, specifically analyzing and discussing both funds with Fiducient at committee meetings. *See* Defs.' SUMF ¶¶ 83–87, 93–97 []. Throughout the process, IC followed the advice of Fiducient and eventually sold the Fort Washington and Artisan funds in August 2019 and September 2021, respectively. *See id.* ¶¶ 87, 97. Plaintiffs argument that for years Defendants merely conducted meetings and reviews and ignored "alarming information" is unsupported by the factual record.

JA000008 (Order at 8).

The District Court was legally and factually incorrect on several fronts. First, the paragraphs that the District Court cites are all facts relating to ***Fiducient's actions and materials***, not the IC's interaction with the information. As Dyson states in his rebuttal, Defendants' expert Case's report exhibits undermine Defendants' process and performance arguments. *See* Section V.F., *supra*. The instant facts are similar to the District of New Jersey case of *Olsen v. Hegarty*, 180 F. Supp. 2d 552 (D.N.J. 2001). In *Olsen*, the court denied the defendants' motion for summary judgment because the fiduciaries "upon receiving an investment report at their quarterly meeting, would adopt Defendants Hegarty and Campbell's purchase or sale decisions after the fact, without question or debate as to either the specifics of that particular investment." *Id.* at 558-59; *see also Terraza v. Safeway Inc.*, No. 16-cv-03994, 2019 WL 12872958, at

*4 (N.D. Cal. Apr. 16, 2019) ("There is also a disputed issue of fact regarding whether Aon should have placed this fund on a 'watch list.'"). In the instant case, the IC never questioned why the Challenged Funds were not on the watchlist despite the meetings and condemnatory investment reports. Moreover, other courts have held that having special, off-cycle meetings to discuss funds does not definitively prove prudence. *See Terraza*, 2019 WL 12872959, at *3. Here, among the two funds, there was only one special meeting, and it was held too late because the losses had already compounded over several years.

The record of the IC's silence during meetings is materially distinguishable from the "[e]vidence of discussions about the pros and cons of investment alternatives." JA000006 (Order at 6n.7; quoting *Cunningham v. Cornell Univ*., No. 16-cv-6525, 2019 WL 4735876, at *14 (S.D.N.Y. Sept. 27, 2019)). The court in *Jacobs v. Verizon Commc'ns* applied *Cunningham's* holding that "[performance of a fund that '[falls] below . . . benchmarks established by plan documents' or 'some other metric or method used by prudent investors at the time' may signal an imprudent investment subject to additional review or monitoring." *Jacobs*, No. 16-cv-1082, 2023 WL 3027311, at *20 (S.D.N.Y. Apr. 20, 2023) (quoting *Cunningham*, 2019 WL 4735876, at *11). The court further held that the period of "evidence that [defendants] began giving some attention to the [Challenged] Fund" did not begin until after the plaintiffs' expert opined the challenged fund should have been removed. *Id*. at *23. The same is true here, where Dyson opined the Artisan Fund should have been

removed in 2015, but the first time the IC questioned its underperformance was in 2017, and the special meeting was not held until September of 2021. *See* JA000270-81 (Case Rpt., Ex. 5A). This is precisely why trial is appropriate, to weigh these competing narratives with live testimony and cross examination. *See Mitchell*, 365 F.3d at 245; *Terraza*, 2019 WL 12872959, at *2 ("Determining which version of events is persuasive will require credibility findings that the Court cannot make on a paper record.").

Second, fiduciaries cannot escape liability simply by removing imprudent funds at some point. Fiduciaries are liable unless they remove funds "within a ***reasonable*** time." *Hughes*, 142 S. Ct. at 742 (emphasis added). Dyson opines that the IC's scrutiny of the funds' underperformance was too late, and hence so too was the decision to remove the funds. This creates a dispute as to whether the funds were replaced within a prudent, reasonable amount of time. *See Jacobs,* 2023 WL 3027311, at *25; *Terraza*, 2019 WL 12872958. Third, and related to the first and second points, there is a genuine dispute as to whether Defendants ignored red flags by way of the IC's lack of investigation into the missing Fort Washington Fund data and repeated Artisan Fund underperformance. *See Terraza*, 2019 WL 12872958, at *5 ("There is a triable issue of material fact as to whether Aon met its duty of prudence to monitor the performance of the [challenged fund]" that underperformed against its designated benchmark "for a maximum of four consecutive quarters"). Fiducient's quarterly reviews repeatedly communicated underperformance in-real-time. Contrary to the District Court's

holding, there is a genuine dispute as to whether the IC ignored repetitive information and should have acted sooner. *See Harley*, 42 F. Supp. 2d at 915–16 ("Although 3M suggests that the Class's claim is based on 'hindsight evidence,' the Class has provided evidence that much of this information could have been gleaned from sources available before and during the Granite investment."). The District Court supported its holding by pointing to *Jenkins v. Yager*, 444 F.3d 916 (7th Cir. 2006), where the court denied *plaintiffs'* motion for summary judgment. Nonetheless, the court in *Jenkins* held that "[g]iven that the profit-sharing funds in the plan experienced losses, it is possible that [Defendant's] alleged breach of his fiduciary obligation caused these losses." *Jenkins*, 444 F.3d at 929. It is evident that the IC's breaches caused losses to the Plan.

The District Court also criticized Dyson's use of benchmark indices compiled in 2022 because "that data was unavailable to IC when it made its decision to retain the funds." JA000008 (Order at 8n.9). But Dyson's indices are for damages purposes. The IC had their own condemnatory real-time data available throughout the Class Period. *See Harley*, 42 F. Supp. 2d at 915–16. Defendants can cross-examine Dyson regarding damages at trial. *See Waldner v. Natixis Inv. Managers, L.P.*, No. 21-cv-10273, 2024 WL 4002674, at *7 (D. Mass. Aug. 21, 2024), *report and recommendation adopted*, No. 21-cv-10273, 2024 WL 4134320 (D. Mass. Sept. 10, 2024) ("questions of loss and loss causation are inherently backward looking.").

Fourth, the District Court improperly viewed the performance history in favor of Defendants by reasoning that: (1) underperformance "does not indicate that a

prudent fiduciary, even knowing of the funds' underperformance, would have removed the funds sooner;" and (2) because "both funds had points where they exceeded their benchmarks," they were not imprudent. JA000008 (Order at 8). Both of these reasons improperly set aside Plaintiffs' showing of imprudent processes. The District Court's first reason baselessly assumes that Defendants had their reasons for retaining underperforming funds, *without citing Defendants' reasons*. In *George*, the Seventh Circuit reversed the district court's grant of summary judgment because "the district court made various statements indicating that it thought that Plan fiduciaries had made a reasoned decision to maintain the status quo, it did not cite a document or affidavit, or any deposition testimony, explaining what that decision was." *George*, 641 F.3d at 795. The District Court made the same error here.

The District Court's second reason, noting periods of better performance, ignores that the number of periods of underperformance overwhelm any outlying periods of better performance. Underperformance is a disputed material fact despite anomaly periods of better performance. "Just as it is true that the Court may not assume a violation of fiduciary duty based upon evidence of severe losses alone, neither may the Court conclude that these same duties were not violated simply because the Fund did not suffer huge actual losses." *Olsen*, 180 F. Supp. 2d at 569; *see also Karg v. Transamerica Corp.*, No. 18-cv-134, 2019 WL 3938471, at *7 (N.D. Iowa Aug. 20, 2019) (positive performance "in certain years within the period" did not undermine the fact that "each of the challenged funds failed to outperform the comparable funds

or the relevant benchmark over the relevant period as a whole," thereby created a "factual issue."). Indeed, the degree of underperformance here was significant as shown by the Challenged Funds' rankings and Dyson's overall damages calculations. *See* JA003241, JA003245 (PSOF, ¶¶170-71, 189). Importantly, Dyson's damages calculations included these sparse periods of better performance, but still found a combined total of $17,921,241.40 in losses for the two Challenged Funds. *Id*.

Critically, the underperformance here was measured by an appropriate benchmark of funds in the same investment category, and reported by FIA's own benchmarks. This makes the comparison of funds with distinct "strategies, objectives, or risk profiles" in the motion to dismiss case of *Smith* distinguishable. JA000007 (Order at 7, citing *Smith*, 37 F.4th at 1167). The duration and degree of underperformance creates a genuine factual dispute precluding summary judgment.

## 2.    The IPS

The District Court improperly discredited Dyson's IPS opinions in holding that "[w]here undisputed evidence demonstrates a prudent process, Plaintiffs cannot argue that vague or imprecise aspects of the IPS indicate imprudence." JA000006 (Order at 6). On top of the fact that there *is* evidence of imprudent processes, Dyson opines on how an IPS written in accordance with the prevailing industry standards would have: (1) prevented the extended losses of the funds; (2) prevented the imprudent decision to only use actively managed funds in GoalMaker; and (3) provided guidance for independently assessing the information Fiducient provided. *See* Section V.F., *supra*.

Here, the District Court discounted Dyson's opinions and adopted Defendants' belief that the IPS was sufficiently guiding enough. JA000007 (Order at 7). Plaintiffs also dispute that the IC used the IPS to the extent that it did exist. *See* JA003181 (PSOF, ¶45); JA003189 (PSOF ¶61). Subpar IPSs are relevant to the creation of disputed facts precluding summary judgment. *See, e.g., Alco Industries*, 527 F. Supp. 2d at 412 (noting the "somewhat amorphous investment policy statement" in holding that "[a]t trial, I will undertake to determine [...] the proper interpretation of the policy statement."); *Mattson v. Milliman, Inc.*, No. 22-cv-0037, 2024 WL 340589, at *3 (W.D. Wash. Jan. 30, 2024) ("Dr. Laffer's testimony regarding the Plan's IPS 'may well be useful' to the Court in evaluating whether Defendants complied with their fiduciary obligations."); *Trauernicht*, 2024 WL 3996019, at *4 (same). Many courts have held that explicit IPS guidance "is at least relevant to a fiduciary duty analysis." *Jones v. DISH Network Corp.*, No. 22-cv-00167, 2023 WL 7458377, at *8 (D. Colo. Nov. 6, 2023), *report and recommendation adopted*, No. 22-cv-00167, 2023 WL 8170913 (D. Colo. Nov. 24, 2023) (listing cases).

The District Court relied on the IPS findings in *Falberg v. Goldman Sachs Grp., Inc*, (JA000006-07, Order at 6-7), but in *Falberg* the plaintiff "d[id] not point to any evidentiary basis for concluding that a prudent fiduciary would have necessarily adopted an IPS." *Falberg*, No. 22-cv-2689, 2024 WL 619297, at *3 (2d Cir. Feb. 14, 2024). Here Plaintiffs cite Dyson's report detailing industry standards, including his firsthand experience. *See* JA003240-41 (PSOF at ¶¶167-69). The *Falberg* defendants

also had sufficient procedural substitutes for an IPS, and the plaintiffs' expert believed that fiduciaries could be prudent without one. *See Falberg*, 2024 WL 619297, at *3. Dissimilarly, Dyson opines that a prudent IPS would have brought Defendants' review processes in line with the prevailing standard of care.

Granting summary judgment was inappropriate because there is a genuine dispute over the prudence of Defendants' processes, and the degree of underperformance is a matter of damages not prudence.

### 3.    Recordkeeping Disputes

The District Court viewed the facts in a light most favorable to Defendants by finding that "appointing an investment advisor is evidence of 'thorough investigation' and 'procedural prudence and proper monitoring.'" JA000006 (Order at 6n.6, quoting *Cunningham*, 2019 WL 4735876, at *13. This is exactly what many Circuits instruct is **_not_** conclusive evidence of prudence. *See In re Unisys Savings Plan Litigation*, 74 F.3d at 435; *Brundle ex rel. Constellis Emp. Stock Ownership Plan v. Wilmington Tr.,* 919 F.3d 763, 773 (4th Cir. 2019) ("such advice 'is not a magic wand that fiduciaries may simply wave over a transaction to ensure that their responsibilities are fulfilled.'"); *George*, 641 F.3d at 799 ("The district court further erred by determining at the summary judgment stage that defendants satisfied their duty of prudence by relying on the advice of their consultants."); *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 919 (8th Cir. 1994) (same); *Fink v. Nat'l Sav. & Tr. Co.*, 772 F.2d 951, 957 (D.C. Cir. 1985) ("beneficiaries are entitled to assume that in performing these acts,

the fiduciaries thought about them."); *Howard v. Shay*, 100 F.3d 1484, 1489 (9th Cir. 1996) (engaging third party advisors "is not a complete defense to a charge of imprudence."). Had the IC investigated whether Fiducient was giving prudent advice, they would have discovered the industry standard and DOL assumption that fiduciaries conduct an RFP every 3-5 years. The belated RFI was telling. The Plan was not getting the same degree of discounts for using its recordkeeper's proprietary products as all four competitors were providing. JA000158-59 (Dyson Rpt. ¶¶55-56).

Dyson opines that a more competitive pricing investigation in the form of an RFP was needed, but never occurred. *See* JA000158-59 (Dyson Rpt., ¶¶54, 56). Accordingly, "the opinions of the parties' experts as to the proper industry protocol and the amount of fees that should be considered reasonable are in stark contrast. Both parties also present competing narratives surrounding the decision not to conduct an RFP." *Tracey v. Massachusetts Inst. of Tech.*, 404 F. Supp. 3d 356, 362–63 (D. Mass. 2019). This dispute is "more than superficial" and precludes summary judgment. *Id.*; *see also Cates*, 2019 WL 8955333, at *9 (Columbia asserts that members of the IAC made a "conscious decision" to use benchmarking and an RFI process instead of an RFP. […] Nonetheless, Plaintiffs have adduced evidence that Columbia paid excessive fees as a result of its failure to conduct an RFP."); *Bell*, 2019 WL 387214, at *7 ("According to Plaintiffs, the Defendants also failed to engage in a prudent process for selecting the Plan's recordkeeper because they only once analyzed the reasonableness of fees and never conducted a request for proposal.").

The District Court found that because Fiducient never reported that fees were excessive, the IC cannot be held responsible. *See* JA000004 (Order at 4). But Fiducient never conducted any in-depth investigations or follow up negotiations, and the IC never held them to task. Further, the Fiducient *did* report that the TPC was excessive including the recordkeeping fees and despite the purported benefit of revenue sharing. *See* JA003236-37 (PSOF, ¶¶151-55). Again, courts have held that meeting minutes, advisors, and bidding does not justify summary judgment for the defendant. *See In re Unisys Sav. Plan Litigation*, 74 F.3d at 430; *Davis*, 2023 WL 3821807, at *7; *McCool*, 2023 WL 2752400, at *3; *In Re Omnicom Group Inc.*, 2022 WL 18674830, at *16; *Feinberg*, 2021 WL 488631, at *8; *Terraza*, 2019 WL 12872959, at *3. Indeed, there is a genuine dispute over whether Defendants' processes were in accord with the prevailing standard, not whether processes existed at all. *See Sacerdote*, 9 F.4th at 111.

The District Court also incorrectly characterized the law in holding that, "[i]rrespective of process, courts have found that an overall decrease in recordkeeping fees supports a finding of objective prudence." JA000009 (Order at 9n.10). However, the decreases here were not due to Defendants' conduct, but instead an increase in assets, and even with the decreases the fees were still excessive. *See* JA003221 (PSOF, disputing ¶123). The District Court supported its holding with a cite to the post-trial finding in *Nunez II*, but noted that the decrease in fees was only "part" of the court's finding of prudence. JA000009 (Order at 9n.10, quoting *Nunez II,* 2023 WL 5339620, at *12). In fact, the full *Nunez II* finding was not "irrespective of process," because,

unlike here, the fee decreases were a result of negotiations occurring after a benchmarking in 2014, a 2018 RFI, and a 2019 RFP, and fees were negotiated with the recordkeeper "on multiple occasions." *Nunez II*, 2023 WL 5339620, at *9. Basically, at trial, the court in *Nunez II* found that the defendants did everything that Defendants here should have done. Nonetheless, other courts have found that, as a matter of law, "a high fee may reflect imprudence even if the fee falls year-over-year." *Johnson v. PNC Fin. Servs. Grp., Inc.*, 2021 WL 3417843, *4 (W.D. Pa. Aug. 3, 2021). Indeed, under ERISA fiduciaries are "obligated to ***minimize*** costs," not just lower costs. *Tibble v. Edison, Int., et al*, 843 F.3d 1187, 1198 (9th Cir. Dec 30, 2016) (citing Unif. Prudent Investor Act § 7) (emphasis added). Therefore, the fact that "fees were lowered by some amount during the relevant period does not establish as a matter of law that [Defendants] discharged [their] duty of prudence." *Terraza*, 2019 WL 1589979, at *2.

### E.    Plaintiffs' Derivative Claims

The District Court also granted summary judgment as to Plaintiffs' second claim for failure to monitor other fiduciaries, because it is derivative of Plaintiffs' imprudence claim. *See* JA000010 (Order at 10). Because the underlying breach of prudence claim should have survived summary judgment, Plaintiffs request that this Court also find that the District Court erred in granting the summary judgment of Plaintiffs' duty to monitor claim.

## VII.   CONCLUSION

For the forgoing reasons, Plaintiffs-Appellants respectfully request the Court reverse the District Court's decision granting Defendants-Appellees' motion summary judgment and remand this case to the District Court for further proceedings on the merits.

Dated:  October 15, 2024                     Respectfully submitted,

*/s/ Mark K. Gyandoh*
Mark K. Gyandoh
CAPOZZI ADLER, P.C.
312 Old Lancaster Road
Merion Station, PA  19066
Telephone: (610) 890-0200
Facsimile:  (717) 233-4103
Email: mark@capozziadler.com

*Counsel for Plaintiffs-Appellants*

## CERTIFICATES OF COMPLIANCE

In accordance with Local Appellate Rules 28.3(d) and 46.1(e), I certify that all attorneys whose names appear on this brief are members in good standing of the bar of this Court or have filed an application for admission.

In accordance with Local Appellate Rule 31.1(c), I certify that the texts of the electronic brief and paper copies are identical and that AVG AntiVirus was run on the file and did not detect a virus.

In accordance with Federal Rule of Appellate Procedure 32(g)(1), I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,936 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f ) and Circuit Rule 32(e)(1), according to the word count of Microsoft Word.  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in Times New Roman 14-point font, a proportionally spaced typeface.

Dated: October 15, 2024                    /s/ *Mark K. Gyandoh*
                                            Mark K. Gyandoh
                                            *Counsel for Plaintiffs-Appellants*

**CERTIFICATE OF SERVICE**

I hereby certify that counsel for all parties are registered as Filing Users of the Court's CM/ECF system and that a copy of the foregoing Brief of Appellants and Appendix Volume I will be served electronically on this date by operation of the Court's CM/ECF system.

Dated: October 15, 2024                    _/s/ Mark K. Gyandoh_____

No. 24-2392

# United States Court of Appeals
*for the*
# Third Circuit

RHONDA ALLEN, STEHLE HARRIS, DAVID ELLIOTT,
Individually and on behalf of all other similarly situated,

*Plaintiffs-Appellants*,

v.

EVONIK CORPORATION, PRESIDENT OF EVONIK CORPORATION,
BOARD OF DIRECTORS OF EVONIK CORPORATION, EVONIK
INVESTMENT COMMITTEE; JOHN DOES 1-30,
Whose Names Are Currently Unknown,

*Defendants-Appellees*.

_____

On Appeal from the United States District Court
For the District of New Jersey
No. 2:20-cv-02202-MCA-MAH (Hon. Madeline Cox Arleo)

---

**BRIEF OF APPELLANTS AND JOINT APPENDIX I, JA000001-JA000010**

---

Mark K. Gyandoh
CAPOZZI ADLER, P.C.
312 Old Lancaster Road
Merion Station, PA 19066
Telephone: (610) 890-08200
Fax: (717) 233-4101
Email: markg@capozziadler.com

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

## VOLUME I, PAGES JA000001 TO JA000010

Letter Order,
Filed June 28, 2024 (No. 2:20-cv-02202, ECF 47) .................................JA000001

## VOLUME II, PAGES JA000011 TO JA000304

Docket Entries in the District Court Proceedings,
Dated October 9, 2024 (No. 2:20-cv-02202)............................................JA000011

Plaintiffs' First Amended Complaint,
Filed December 7, 2021 (No. 2:20-cv-02202, ECF 46) ...........................JA000025

Notice of Motion for Defendants' Motion for Summary Judgment
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 86)..........................JA000072

Defendants' Statement of Undisputed Material Facts in
Support of its Motion for Summary Judgment
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 86-1) ......................JA000075

Defendants' Brief in Support of Motion for Summary Judgment
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 86-2) ......................JA000107

Declaration of Christopher Rowlings
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 86-3) ......................JA000134

Declaration of Stacey C.S. Cerrone
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 86-4) ......................JA000137

Exhibit A – Revised Expert Report of Eric C. Dyson CFP ®, AIF®
Dated October 6, 2022
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 86-5) ......................JA000140

Exhibit B – Revised Expert Report of Eric C. Dyson CFP ®, AIF®,
Dated November 30, 2022
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 86-6) ......................JA000192

Exhibit C – Expert Report of Steven Case,
Dated October 28, 2022
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 86-7) ......................JA000206

## **VOLUME III, PAGES JA000305 TO JA000750**

Exhibit D – Expert Rebuttal Report of Steven K. Gissiner
Dated November 28, 2022
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 86-8) ......................JA000305

Exhibit E – Expert Report of John Chalmers, PH.D.
Dated October 28, 2022
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 86-9) ......................JA000436

Exhibit F – Deposition Transcript Excerpts of Stehle Harris
Dated May 24, 2022
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 86-10) ....................JA000560

Exhibit G – Deposition Transcript Excerpts of David Elliott
Dated June 2, 2022
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 86-11) ....................JA000564

Exhibit H – Deposition Transcript Excerpts of Jignesh Admin
Dated June 24, 2022
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 86-12) ....................JA000568

Exhibit I – Deposition Transcript Excerpts of John Gregory Rolando
Dated June 30, 2022
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 86-13) ....................JA000579

Exhibit J – Deposition Transcript Excerpts of Burkhard Zoller
Dated June 30, 2022
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 86-14) ....................JA000589

Exhibit K – Deposition Transcript Excerpts of Randy Cherkis
Dated June 22, 2022
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 86-15) ....................JA000605


Exhibit L – Deposition Transcript Excerpts of John Chalmers, PH.D.
Dated February 15, 2023
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 86-16) ....................JA000673


Exhibit M – Deposition Transcript Excerpts of Eric Dyson
Dated March 7, 2023
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 86-17) ....................JA000681


Exhibit N – Defendants' Supplemental and Amended Responses to Plaintiffs'
First Set of Interrogatories Directed to Defendants
Dated July 11, 2022
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 86-18) ....................JA000729


Proposed Order to Defendants' Motion for Summary Judgment
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 86-19) ....................JA000749


**VOLUME IV, PAGES JA000751 TO JA001020**


Declaration of Randy Cherkis
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87)..........................JA000751


Exhibit 1 – Unanimous Written Consent of the Board of Directors of
Degussa Corporation
Dated June 30, 2023
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-1) ......................JA000760


Exhibit 2 – Final Minutes of Investment Committee Meeting - Evonik Corporation
Dated August 25, 2017
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-2) ......................JA000767

Exhibit 3 – Final Minutes of Investment Committee Meeting - Evonik Corporation
Dated June 19, 2019
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-3) ......................JA000770


Exhibit 4 – Final Minutes of Investment Committee Meeting - Evonik Corporation
Dated August 12, 2019
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-4) ......................JA000774


Exhibit 5 – Final Minutes of Investment Committee Meeting - Evonik Corporation
Dated December 10, 2019
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-5) ......................JA000777


Exhibit 6 – Final Minutes of Investment Committee Meeting - Evonik Corporation
Dated May 27, 2020
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-6) ......................JA000780


Exhibit 7 – Final Minutes of Investment Committee Meeting - Evonik Corporation
Dated May 11, 2021
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-7) ......................JA000784


Exhibit 8 – Minutes of Investment Committee Meeting - Evonik Corporation
Dated August 4, 2021
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-8) ......................JA000789


Exhibit 9 – Off-Cycle Investment Committee Meeting
Dated September 2, 2021
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-9) ......................JA000794


Exhibit 10 – Final Minutes of Administrative Committee Meeting - Evonik
Corporation
Dated September 2,5 2021
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-10) ....................JA000798

Exhibit 11 – Final Minutes of Administrative Committee Meeting - Evonik
Corporation
Dated May 27, 2020
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-11) .....................JA000804

Exhibit 12 – 2013 Form 5500
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-12) ....................JA000807
Exhibit 13 – 2014 Form 5500
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-13) ....................JA000884

Exhibit 14 – 2015 Form 5500
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-14) ....................JA000958

**VOLUME V, PAGES JA001021 TO JA001287**

Exhibit 15 – 2016 Form 5500
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-15) ....................JA001021

Exhibit 16 – 2017 Form 5500
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-16) ....................JA001096

Exhibit 17 – 2018 Form 5500
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-17) ....................JA001191

**VOLUME VI, PAGES JA001288 TO JA001580**

Exhibit 18 – 2019 Form 5500
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-18) ....................JA001288

Exhibit 19 – Summary Plan Description
Dated January 1, 2020
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-19) ....................JA001385

Exhibit 20 – Investment Policy Statement
Dated August 2014
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-20) ....................JA001423


Exhibit 21 – Investment Policy Statement
Updated December 2015
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-21) ....................JA001430


Exhibit 22 – Investment Policy Statement
Updated December 2019
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-22) ....................JA001437


Exhibit 23 – Election of Services
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-23) ....................JA001444


Exhibit 24 – Expense Schedule
Dated November 29, 2012
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-24) ....................JA001448


Exhibit 25 – Amendment to Administrative Services Agreement
Dated October 1, 2017
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-25) ....................JA001463


Exhibit 26 – Amendment to Administrative Services Agreement
Dated December 31, 2008
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-26) ....................JA001469


Exhibit 27 – Amendment to Administrative Services Agreement
Dated May 9, 2019
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-27) ....................JA001473


Exhibit 28 – Amendment to Administrative Services Agreement

Dated August 28, 2019
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-28) ...................JA001478


Exhibit 29 – Amendment to Administrative Services Agreement
Dated January 1, 2020
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-29) ...................JA001483


Exhibit 30 – Overview of Plan Investment Options and Fees
Dated March 31, 2014
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-30) ...................JA001490


Exhibit 31 – Overview of Plan Investment Options and Fees
Dated March 31, 2015
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-31) ...................JA001502


Exhibit 32 – Overview of Plan Investment Options and Fees
Dated March 31, 2016
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-32) ...................JA001515


Exhibit 33 – Overview of Plan Investment Options and Fees
Dated March 31, 2017
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-33) ...................JA001528


Exhibit 34 – Overview of Plan Investment Options and Fees
Dated March 31, 2018
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-34) ...................JA001542


Exhibit 35 – Overview of Plan Investment Options and Fees
Dated March 31, 2019
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-35) ...................JA001553


Exhibit 36 – Overview of Plan Investment Options and Fees
Dated March 31, 2020
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-36) ...................JA001567

Exhibit 37 – Overview of Plan Investment Options and Fees
Dated April 30, 2021
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-37) ....................JA001574

**VOLUME VII, PAGES JA001581 TO JA001828**

Exhibit 38 – Overview of Plan Investment Options and Fees
Dated January 31, 2022
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-38) ....................JA001581

Exhibit 39 – Important News about Fee and Fund Changes
Dated January 3, 2022
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-39) ....................JA001588

Exhibit 40 – Notice of Qualified Automatic Contribution Arrangement and
Qualified Default Investment Alternative
Dated January 1, 2020
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-40) ....................JA001631

Exhibit 41 – Quarterly Investment Review – First Quarter 2014
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-41) ....................JA001640

Exhibit 42 – Quarterly Investment Review – Fourth Quarter 2014
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-42) ....................JA001720

**VOLUME VIII, PAGES JA001829 TO JA002113**

Exhibit 43 – Quarterly Investment Review – Fourth Quarter 2015
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-43) ....................JA001829

Exhibit 44 – Quarterly Investment Review – First Quarter 2016
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-44) ....................JA001907

Exhibit 45 – Quarterly Investment Review – First Quarter 2017
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-45) ...................JA001995


Exhibit 46 – Quarterly Investment Review – Second Quarter 2017 (Part 1)
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-46) ...................JA002077


**VOLUME IX, PAGES JA002114 TO JA002454**


Exhibit 46 – Quarterly Investment Review – Second Quarter 2017 (Part 2)
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-47) ...................JA002114


Exhibit 47 – Quarterly Investment Review – Fourth Quarter 2017
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-48) ...................JA002156


Exhibit 48 – Quarterly Investment Review – First Quarter 2017
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-49) ...................JA002238


Exhibit 49 – Quarterly Investment Review – First Quarter 2019
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-50) ...................JA002312


**VOLUME X, PAGES JA002391 TO JA002677**


Exhibit 50 – Quarterly Investment Review – Fourth Quarter 2019 (Part 1)
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-51) ...................JA002391


Exhibit 50 – Quarterly Investment Review – Fourth Quarter 2019 (Part 2)
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-52) ...................JA002427


Exhibit 51 – Quarterly Investment Review – First Quarter 2020 (Part 1)
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-53) ...................JA002465


Exhibit 51 – Quarterly Investment Review – First Quarter 2020 (Part 2)
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-54) ...................JA002507


Exhibit 52 – Quarterly Investment Review – Fourth Quarter 2020 (Part 1)

Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-55) ...................JA002553

Exhibit 52 – Quarterly Investment Review – Fourth Quarter 2020 (Part 2)
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-56) ...................JA002595

Exhibit 53 – Quarterly Investment Review – Fourth Quarter 2020 (Part 1)
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-57) ...................JA002637

## **VOLUME XI, PAGES JA002678 TO JA002968**

Exhibit 53 – Quarterly Investment Review – Fourth Quarter 2020 (Part 2)
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-58) ...................JA002678

Exhibit 54 – Quarterly Investment Review – Fourth Quarter 2021 (Part 1)
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-59) ...................JA002715

Exhibit 54 – Quarterly Investment Review – Fourth Quarter 2021 (Part 2)
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-60) ...................JA002762

Exhibit 55 – Quarterly Investment Review – First Quarter 2022 (Part 1)
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-61) ...................JA002805

Exhibit 55 – Quarterly Investment Review – First Quarter 2022 (Part 2)
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-62) ...................JA002849

Exhibit 56 – Pension Plan and Fee Benchmarking Analysis
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-63) ...................JA002894

Exhibit 57 – Plan Pricing Analysis
Dated December 2015
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-64) ...................JA002946

## **VOLUME XII, PAGES JA002969 TO JA003322**

Exhibit 58 – Fee Analysis
Dated August 2018
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-65) ...................JA002969

Exhibit 59 – Goal Maker & Fee Benchmarking
Dated August 2018

Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-66) ...................JA002985

Exhibit 60 – Goal Maker & Fee Benchmarking
Dated August 2018
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-67) ...................JA003019

Exhibit 61 – A New Enhanced Future Experience for Evonik &
Your Plan Participants – Aon Hewitt
Dated July 28, 2016
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-68) ...................JA003059

Exhibit 62 – Schedule of Fees and Services
Dated May 2019
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-69) ...................JA003089
Exhibit 63 – Randy Cherkis Email re Fidelity Sample Pricing
Dated June 4, 2021
Filed September 28, 2023 (No. 2:20-cv-02202, ECF 87-70) ...................JA003105

Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion
for Summary Judgment
Filed November 2, 2023 (No. 2:20-cv-02202, ECF 89).........................JA0003110

Plaintiffs' Responses to Defendants' Statement of Undisputed
Material Facts and Counter Statement of Material Facts in Opposition
to Defendants' Motion for Summary Judgment
Filed November 2, 2023 (No. 2:20-cv-02202, ECF 90).........................JA0003155

Reply Memorandum in Support of Defendants' Motion for
Summary Judgment
Filed November 17, 2023 (No. 2:20-cv-02202, ECF 93).......................JA0003248

Declaration of Randy Cherkis
Filed November 17, 2023 (No. 2:20-cv-02202, ECF 93-1) ...................JA0003268

Exhibit 64 – Final Minutes of Investment Committee Meeting
Dated September 25, 2018
Filed November 17, 2023 (No. 2:20-cv-02202, ECF 93-2) .....................JA003270

Declaration of Stacey C.S. Cerrone
Filed November 17, 2023 (No. 2:20-cv-02202, ECF 93-3) .....................JA003273

Exhibit O – Defendants Letter to Plaintiffs re Expert Report of Eric C. Dyson
enclosing MGM Order
Dated September 26, 2022
Filed November 17, 2023 (No. 2:20-cv-02202, ECF 93-4) .....................JA003275
Exhibit P – Email from Defendants to Plaintiffs re missing sections of
Expert Report of Eric C. Dyson
Dated October 4, 2022
Filed November 17, 2023 (No. 2:20-cv-02202, ECF 93-5) .....................JA003282

Defendants' Reply to Plaintiffs' Response to Defendants' Statement of Facts
and Response to Plaintiffs' Counter Statement of Facts
Filed November 17, 2023 (No. 2:20-cv-02202, ECF 93-6) .....................JA003288

## VOLUME XIII, PAGES JA003323 TO JA003336

Letter Order from Court Granting Defendants' Motion for Summary Judgment
Filed June 28, 2024 (No. 2:20-cv-02202, ECF 101) .................................JA003323

Notice of Appeal to U.S. Court of Appeals for the Third Circuit
Filed July 26, 2024 (No. 2:20-cv-02202, ECF 103).................................JA003333

Order Denying Motion for Summary Judgment
*Tania Nunez, et al., v. B. Braun Medical, Inc., et al.* No. 20-4195 (ED PA)
Dated April 21, 2021 (ECF 112)................................................................JA003334

<div align="right">CLOSING</div>

<div align="center">

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

</div>

| CHAMBERS OF | MARTIN LUTHER KING COURTHOUSE |
|---|---|
| MADELINE COX ARLEO | 50 WALNUT ST. ROOM 4066 |
| UNITED STATES DISTRICT JUDGE | NEWARK, NJ 07101 |
| | 973-297-4903 |

June 28, 2024

<u>VIA ECF</u>

<div align="center">

**LETTER ORDER**

</div>

Re:     <u>Silva, et al. v. Evonik Corp., et al.</u>
         <u>Civil Action No. 20-02202</u>

Dear Litigants:

Before the Court is Evonik Corporation ("Evonik"), the President of Evonik ("President"), the Board of Directors of Evonik (the "Board"), and the Evonik Investment Committee's ("IC") (collectively, "Defendants") Motion for Summary Judgment (the "Motion"). ECF No. 86. Plaintiffs Stehle Harris and David Elliot ("Plaintiffs") oppose the Motion. ECF No. 89. For the reasons explained below, Defendants' Motion is **GRANTED**.

I.     **BACKGROUND**[1]

This putative ERISA class action arises out of Defendants' selection and maintenance of investment options offered by Evonik 's 401(k) Savings Plan ("The Plan"). Plaintiffs—former employees of Evonik and participants in the Plan—assert that Defendants have failed to adequately monitor the Plan to ensure that its investment options and costs were financially prudent.

Plaintiffs seek to recover damages under ERISA for (1) IC's alleged breach of the duty of prudence (Count I); and (2) Evonik, the President, and the Board's alleged breach of the duty to monitor other fiduciaries in their selection and maintenance of investment options offered by the Plan (Count II). See ECF Nos. 25, 46.

---

[1] Unless otherwise indicated, the Court draws the following facts from Defendants' Statement of Undisputed Material Facts ("Defendants' SUMF"), ECF No. 86.1, Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts and Counter Statement of Material Facts ("Plaintiffs' SUMF"), ECF No. 90, and Defendants' Reply to Plaintiffs' Response to Defendants' Statement of Facts and Response ("Defendants' RSUMF"), ECF No. 93.6. The Court will not consider any statements made in these filings that are unsupported, conclusory allegations. See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) (A non-moving party must go "beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, [and] designate specific facts showing that there is a genuine issue for trial" to survive a motion for summary judgment.) (internal quotation marks omitted). The Court cites only to Defendants' SUMF for undisputed facts and otherwise notes any disputes.

<div align="center">1</div>

<div align="right">JA000001</div>

Evonik sponsors its 401(k) Savings Plan, a defined contribution plan that provided retirement benefits to eligible employees. Defs.' SUMF ¶ 2, 38. [2] From 2013 through 2022, the Plan had between about $623 million and $1.38 billion in assets and between about 4,817 and 6,299 members. Id. ¶¶ 39–40. Plaintiffs bring this action on behalf of all participants and beneficiaries of the Plan from February 28, 2014, to present (the "Class Period"). Id. ¶ 25.

Participants had three avenues for building their portfolio. First, they could construct their own portfolio from the core menu of investment options, which included "actively and passively managed mutual funds and separate accounts in major asset classes." Id. ¶¶ 48–49. Second, they could open self-directed brokerage accounts. Id. ¶ 55. Third, they could use GoalMaker, an optional asset allocation tool that allowed participants to construct diversified portfolios based on the core options in the Plan. Id. ¶¶ 50–52. GoalMaker also served as the Plan's qualified default investment alternative ("QDIA")—a default investment for participants. Id. ¶ 51. Accordingly, participants who did not make active investment choices were invested in GoalMaker's moderate portfolio based on the individual's age range. Id. The Plan's overall expense to participants—including investment fees, administrative expenses, and recordkeeping fees—is reflected in a measurement called Total Plan Costs ("TPC").

## A. IC and the Investment Policy Statement

For management of the Plan's investments and recordkeeping fees, the Board created IC. Id. ¶ 33. IC had "fiduciary authority and discretion to select and monitor the Plan's investments and monitor the reasonableness of the Plan's fees." Id. In doing so, IC used an Investment Policy Statement (the "IPS") for investment management, which had "watch list criteria" including "review of benchmark performance as well as risk-adjusted performance, investment objectives, manager changes, and expense ratios compare[d] to category averages." Id. ¶ 62–63.

During the Class Period, the Plan engaged the investment consultant entity Fiducient (formerly known as DiMeo Schneider and Associates, and prior to that, Fidicuary Investment Advisors), which prepared Quarterly Investment Reviews ("QIR") summarizing data and reports on investments in the Plan, including their performance and fees. Id. ¶ 56, 58. Fiducient presented and discussed the QIRs at each quarterly IC meeting, conducted annual reviews focusing on plan fees, including recordkeeping fee benchmarking and Plan investments, and provided "additional services as needed, such as managing requests for information ("RFIs") for recordkeeping services." Id. ¶¶ 59–61. The QIRs provided by Fiducient to IC members included general information about market conditions as well as specific information regarding the Plan's investment, such as asset allocation, fees, and performance against industry benchmarks. Id. ¶ 66. Fiducient maintained a watchlist where each investment option in every QIR was given a rating of "maintain," "watch," "discuss," or "terminate." Id. ¶ 69.

---

[2] "[A] 'defined contribution plan' . . . promises the participant the value of an individual account at retirement, which is largely a function of the amounts contributed to that account and the investment performance of those contributions." LaRue v. DeWolff, Boberg & Assocs., Inc., 552 U.S. 248, 250 n.1 (2008) (citing 29 U.S.C. § 1002(34)).

### B. Investigation and Selection of Investments

Plaintiffs' claim that Defendants breached their duty of prudence relies primarily on their expert, Eric Dyson ("Dyson").  See generally Dyson Rep., ECF No. 86.5.

#### i. Fund Performance

In opining on fund performance, Dyson asserts that the "Plan's menu of investments was imprudent" but only discusses two funds: the Fort Washington Large Cap Core Fund ("Fort Washington")[3] and the Artisan Partners International Growth Fund ("Artisan").  Defs.' SUMF ¶ 108; Pls.' SUMF ¶¶ 106–07.

During the Class Period, the Fort Washington fund had periods of over- and under-performing its benchmark index.  Defs.' SUMF ¶ 83.  It was marked with a "watch" status by Fiducient in August 2017; returned to "maintain" status following an IC discussion; moved back to "watch" status by the Fiducient at a Q3 2019 IC meeting because of its underperformance of its benchmark index, which had not rebounded in light of market conditions; and then, in August 2019, was replaced by IC with a different fund.  Id. ¶¶ 84–87.

The Artisan fund, which could be invested on its own or through GoalMaker, had periods of over- and under-performing its benchmark index, and was discussed at IC meetings.  Id. ¶¶ 90–92.  Fiducient reported to IC that the Artisan fund, even during periods of underperformance, typically rebounded, but assigned Artisan a status of "discuss" for performance reasons for Q4 2020.  Id. ¶¶ 93–94.  In September 2021, IC held an off-cycle meeting to discuss, among other things, a recommendation regarding the Artisan fund because a shift in investment strategy made it duplicative of other funds; IC thereafter replaced the fund.  Id. ¶¶ 95–97.  IC did not retain the Fort Washington or the Artisan funds over Fiducient's objection or advice.  Id. ¶¶ 88, 98.

Dyson considered the two funds' impact on GoalMaker and on the overall portfolio performance.  Pls.' SUMF ¶ 100.  Relying on Dyson's findings, Plaintiffs state that IC was "aware the challenged funds repeatedly fell short of passive benchmark performance in their respective categories including 2015 and the three year and five-year marks."  Id. ¶ 78.  According to Plaintiffs, "the challenged funds were economically unreasonable based on poor returns and should have been removed from [the] Plan earlier."  Id. ¶ 99.

#### ii. TPC and Investment Fees

The Plan's TPC included investment fees, administrative expenses, and recordkeeping fees.  Plaintiffs claim that (1) the Plan had high TPC and (2) such high TPC indicates that the investment fees were excessive.

Dyson generally opines that IC's selection of higher cost shares was one of several failures of the Plan, resulting in high TPC.  See generally Dyson Rep.  Indeed, Plaintiffs assert that "[d]uring the Class Period, the Plan maintained several funds that had lower costs, but otherwise identical, share class versions."  Pls.' SUMF ¶ 165.  In response, Defendants explain that while IC

---

[3] The Fort Washington fund was previously called the Sentinel Common Stock fund.  Defs.' SUMF ¶ 82.

opted for higher <u>gross</u> cost share classes for some funds, they did so to collect revenue sharing that eventually resulted in an overall lower <u>net</u> cost. Defs.' RSUMF ¶ 165. Specifically, Defendants state that such revenue was used to pay the Plan's administrative expenses and recordkeeping fees (but not investment fees), thus defraying the Plan's overall costs. <u>Id.</u>; <u>see also</u> Defs.' SUMF ¶¶ 119–20.

### C. Monitoring Recordkeeping Fees

The Plan used Prudential Retirement Insurance and Annuity Company ("Prudential") as its recordkeeper. Defs.' SUMF ¶ 112. As such, Prudential provided administrative services necessary for 401(k) plan management. <u>Id.</u> ¶ 113. Between 2014 and 2022, the Plan's recordkeeping fees decreased from $116 to $49.50 and, until December 2019, were paid in part by using revenue sharing collected from the Plan's investments. <u>Id.</u> ¶¶ 115, 119. For IC's review, Fiducient conducted a review of such fees and used Prudential's data to produce annual benchmarks. <u>Id.</u> ¶ 122. Fiducient never reported that the Plan's recordkeeping fees were unreasonable. <u>Id.</u> ¶ 144.

In 2021, Fiducient conducted a blind Request for Information ("RFI") for recordkeeping services. It sent a blind fee questionnaire to four recordkeepers, each of which submitted four tiers of price proposals. <u>Id.</u> ¶¶ 125–27. As a threshold consideration, IC did not want to eliminate GoalMaker as the Plan's QDIA or its stable value fund. <u>Id.</u> ¶¶ 128–29. Therefore, IC focused on each provider's Tier One bids for recordkeeping fees.[4] <u>Id.</u> Tier One bids were for open architecture pricing, meaning that the Plan was not required to use the recordkeeper's proprietary products and services and could continue to use GoalMaker or its stable value fund. <u>Id.</u> ¶¶ 127–28. Plaintiffs assert that Defendants should not have limited their focus to only Tier One bids and should have negotiated for lower fees. Pls.' SUMF ¶ 129.

## II. Legal Standard

Under Federal Rule of Civil Procedure 56(c), the Court will grant a motion for summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with available affidavits, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986); <u>Celotex Corp.</u>, 477 U.S. at 322. "[S]ummary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." <u>Miller v. Ind. Hosp.</u>, 843 F.2d 139, 143 (3d Cir. 1988).

The Court construes all facts and inferences in the light most favorable to the non-moving party. <u>Peters v. Del. River Port Auth.</u>, 16 F.3d 1346, 1349 (3d Cir. 1994). "[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 248 (citing <u>First Nat'l Bank of Ariz. v. Cities Serv. Co.</u>, 391 U.S. 253, 288–89 (1968)) (internal quotation marks omitted).

---

[4] Tier One bids for recordkeeping services fees ranged from $41–$54 per participants per year. Defs.' SUMF ¶ 130. Within those bids, two providers offered higher than the Plan's fees and two providers offered lower than the Plan's fees. <u>Id.</u> ¶ 131–32.

JA000004

## III. ANALYSIS

The Employee Retirement Income Security Act of 1974 ("ERISA") statute was created as "a response to 'the lack of employee information and adequate safeguards concerning [employee benefit plans'] operation,'" and "reflects Congress's desire 'that disclosure be made and safeguards be provided with respect to the establishment, operation, and administration of such plans.'" Sweda v. Univ. of Penn., 923 F.3d 320, 326–27 (3d Cir. 2019) (citing 29 U.S.C. § 1001(a)). ERISA imposes a "prudent person" standard of care on fiduciaries. See 29 U.S.C. § 1104(a)(1)(B).

"A claim for fiduciary breach has three elements: (1) a plan fiduciary (2) breaches an ERISA-imposed duty (3) causing a loss to the plan." McCaffree Fin. Corp. v. ADP, Inc., No. 20-5492, 2023 WL 2728787, at *13 (D.N.J. Mar. 31, 2023) (internal citations omitted). The Parties do not dispute whether there is a plan fiduciary and instead dispute whether an ERISA-imposed duty was breached and whether that breach resulted in loss to Plaintiffs.

### A. Duty of Prudence

Plaintiffs fail to raise a triable issue of fact as to whether IC breached its fiduciary duty of prudence by failing to (1) investigate or select investments with lower costs or (2) monitor recordkeeping fees.

An ERISA fiduciary is held to the "prudent person" standard of care and thus must exercise "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). Put simply, the duty of prudence requires a fiduciary to diligently monitor investments. See Tibble v. Edison Int'l, 575 U.S. 523, 530 (2015) (defining breach of duty of prudence as "failing to properly monitor investments and remove imprudent ones"); Cunningham v. Cornell Univ., 86 F.4th 961, 983 (2d Cir. 2023) (same); In re Omnicom Grp. Inc. Erisa Litig., No. 20-4141, 2022 WL 18674830, at *16 (S.D.N.Y. Dec. 23, 2022) (citing Tibble, 575 U.S. at 529) (finding that an ERISA fiduciary "must review investments at 'regular intervals.'").

In assessing this duty, courts look at a fiduciary's "process rather than results," considering "whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular statement." Sweda, 923 F.3d at 329. Such inquiry must evaluate the circumstances present at the time the fiduciary acted. See Hughes v. Nw. Univ., 595 U.S. 170, 177 (2022); see also McCaffree, 2023 WL 2728787, at *13 ("Hindsight indeed is 20/20, so the focus must be on a fiduciary's conduct in arriving at a decision") (internal citations omitted); Falberg v. Goldman Sachs Grp., Inc., No. 19-9910, 2022 WL 4280634, at *11 (S.D.N.Y. Sept. 14, 2022) ("[T]he central question is whether a prudent fiduciary in like circumstances would have acted differently."), aff'd, No. 22-2689, 2024 WL 619297 (2d Cir. Feb. 14, 2024).[5]

---

[5] In evaluating the duty of prudence, the Third Circuit has also recognized an objective standard irrespective of process. See Renfro v. Unisys Corp., 671 F.3d 314, 322 (3d Cir. 2011) ("[W]e have also approved of an approach examining whether a questioned decision led to objectively prudent investments."). In other words, even if a fiduciary failed to properly investigate, it cannot be held liable if the investments were objectively reasonable. See id. (citing cases).

## 1.    Investigation and Selection of Investments

Defendants put forward undisputed facts, which Plaintiffs do not plausibly challenge, showing that IC acted prudently in investigating and selecting investments.

### i.    IC's Process

The Court finds that IC's process for monitoring investments was diligent.  It is undisputed that the Plan engaged Fiducient[6]—which, prior to quarterly meetings IC, prepared and distributed reports containing information on Plan investments' asset allocations, fees, and performance against industry benchmarks.  Defs.' SUMF ¶¶ 58–59.  The reports contained, among other things, a watchlist that assigned investment options ratings, including those to "watch," "discuss," or "terminate" at IC meetings, and undisputed evidence shows that the committee discussed such investments, even having an off-cycle meeting to discuss the Fiducient's recommendation to remove a fund.  Id. ¶¶ 69, 83–87, 95–97.[7]

IC's oversight here is comparable to that of other fiduciaries, whose processes were found to be "deliberative and rigorous."  See, e.g., Falberg v. Goldman Sachs Grp., Inc., No. 22-2689, 2024 WL 619297, at *3 (2d Cir. Feb. 14, 2024) (affirming summary judgment where undisputed evidence revealed that "[t]he Committee's independent advisor continually monitored and evaluated the [p]lan's investment options, and provided the Committee members with detailed information, including monthly and quarterly performance reports" and where "Committee members reviewed those reports prior to attending Committee meetings") (internal citations to record omitted).  Given the thoroughness of Fiducient's reports and the frequency of committee meetings, the Court is satisfied that IC had a prudent process with respect to investments.

### ii.    The Investment Policy Statement

Plaintiffs assert that the vagueness of and lack of detail in the IPS preclude a finding that IC acted with the requisite prudence.  The Court disagrees.

Where undisputed evidence demonstrates a prudent process, Plaintiffs cannot argue that vague or imprecise aspects of the IPS indicate imprudence.  In Falberg, the court, looking to the defendant's process, affirmed summary judgment where the plaintiff alleged that the defendant-committee could not properly scrutinize funds without an IPS.  Id.  The court found that the plaintiff failed to "point to any evidentiary basis for concluding that a prudent fiduciary would

---

[6] The ERISA duty of prudence does not expect that fiduciaries "duplicate their advisers' investigative efforts" and instead requires that they "review the data a consultant gathers, to assess its significance and to supplement it where necessary."  In re Unisys Sav. Plan Litig., 74 F.3d 420, 435 (3d Cir. 1996).  In fact, appointing an investment advisor is evidence of "thorough investigation" and "procedural prudence and proper monitoring."  Cunningham v. Cornell Univ., No. 16-6525, 2019 WL 4735876, at *13 (S.D.N.Y. Sept. 27, 2019) (internal quotation marks omitted) (citing DiFelice v. U.S. Airways, Inc., 49 F.3d 410, 421 (4th Cir. 2007)), aff'd, 86 F.4th 961 (2d Cir. 2023).

[7] This evidence undermines Plaintiffs' duty of prudence claim.  See Cunningham, 2019 WL 4735876, at *14 ("Evidence of discussions about the pros and cons of investment alternatives is fatal to plaintiffs' [imprudent fiduciary] claims.") (internal quotation marks omitted) (citing Tibble v. Edison Int'l, 729 F.3d 1110, 1136 (9th Cir. 2013), vacated on other grounds, 575 U.S. 523 (2015)).

have necessarily adopted an IPS" and noted that the plaintiff even conceded that an IPS is not required for a finding that a fiduciary acted prudently. Id. Here, the evidence is even more favorable for Defendants: not only did an IPS exist, but it provided guidelines for monitoring the Plan's investments, including criteria to evaluate investments and procedures for handling investments of concern. Defs.' SUMF ¶ 62. Importantly, the IPS contained specific watchlist criteria, including reviews of benchmark performance. Id. ¶ 63.[8]

To the extent that Plaintiffs argue the IPS lacked certain criteria—such as a specific time frame for evaluating fund performance and inclusion of certain asset classes—those details were adequately captured in the QIR meetings between IC and Fiducient. See id. ¶¶ 65–72. Therefore, the IPS does not support a finding of breach.

### iii. TPC and Investment Fees

Plaintiffs argue that the Plan's high TPC indicates that the Plan's investment fees were excessive, and thus a breach of Defendants' duty of prudence. See Pls.' Opp'n. at 8. The Court disagrees.

It is undisputed that Defendants offered actively managed funds through GoalMaker and that the Plan's TPC was higher as a result. Defs.' RSUMF ¶ 152. Offering actively managed funds is not in itself imprudent and commonly results in higher fees. See Smith v. CommonSpirit Health, 37 F.4th 1160, 1163 (6th Cir. 2022) (noting that actively managed funds typically charge higher fees because of the "considerable judgment and expertise" required in their management).

Plaintiffs cannot create a fact issue on prudence by evaluating fees for the entire Plan, as opposed to a specific fund. See Pls.' SUMF ¶ 151. Indeed, "a meaningful comparison offered in support of imprudence by fiduciaries must take account of the separate goals and separate risk profiles of the funds at issue." Matney v. Barrick Gold of N. Am., 80 F.4th 1136, 1147 (10th Cir. 2023) (internal quotation marks and citations omitted). In the context of investment fees, a meaningful comparison will assess whether alternative investment options have strategies, objectives, or risk profiles similar to that of the plan's funds. See id. at 1148. Here, Plaintiffs cannot use the Plan's TPC in lieu of a fund-specific analysis. See McCaffree, 2023 WL 2728787, at *15 ("[T]he fact that the Plan's total plan costs are higher than average does not on its own create an inference that Defendants breached their duty of prudence."). This is especially true given that (1) the Plan's TPC included not just investment fees, but also administrative expenses (which are not at issue here) and recordkeeping fees, and (2) Defendants used revenue sharing to lower the Plan's total net cost. Plaintiffs' evidence, which is based only on overall Plan fees, does not present a triable issue regarding investment fees.

---

[8] Plaintiffs cite to Omnicom to argue that the IPS did not contain specific enough criteria for replacing or removing investment funds. But in Omnicom, the court found that the plan at issue "did not include any specific or standardized guidelines for the removal or replacement of investment funds or the placement of investment funds on a watch list." 2022 WL 18674830, at *16 (emphasis added). By contrast, here the IPS contained specific watchlist criteria.

### iv. The Fort Washington and Artisan Funds

Plaintiffs assert that there is a genuine dispute of material fact as to whether the Fort Washington and Artisan funds—which supposedly "fell short of passive benchmark performance"—were removed in a reasonable time. Pls.' Opp'n. at 18. The Court disagrees.

Fatal to Plaintiffs' claims is that IC utilized a prudent process, specifically analyzing and discussing both funds with Fiducient at committee meetings. See Defs.' SUMF ¶¶ 83–87, 93–97; supra Section III.A.1.i. Throughout the process, IC followed the advice of Fiducient and eventually sold the Fort Washington and Artisan funds in August 2019 and September 2021, respectively. See id. ¶¶ 87, 97. Plaintiffs argument that for years Defendants merely conducted meetings and reviews and ignored "alarming information" is unsupported by the factual record.

Process aside, the funds' benchmark performance does not present a triable issue of fact for at least two reasons.[9] First, Plaintiffs' assertion that the Fort Washington and Artisan funds fall short of their benchmarks does not indicate that a prudent fiduciary, even knowing of the funds' underperformance, would have removed the funds sooner. See Jenkins v. Yager, 444 F.3d 916, 926 (7th Cir. 2006) (citing DeBruyne v. Equitable Life Assurance Soc. of the United States, 920 F.2d 457, 465 (7th Cir. 1990)) ("[I]nvestment losses are not proof that an investor violated his duty of care."); see also Cunningham, 2019 WL 4735876, at *11 ("Long-term investment options, like those offered in a retirement plan, may have varying levels of performance over the course of time."). Second, both funds had points where they exceeded their benchmarks as well. Defs.' SUMF ¶¶ 83, 91. Any discrepancy in benchmark performance cannot, on its own, support a finding of imprudence. See Smith, 37 F.4th at 1167 (finding that while "an after-the-fact performance gap between benchmark comparators . . . may offer a building block for a claim of imprudence" it does not "by itself violate[] the process-driven duties imposed on ERISA fund managers").

The Court therefore grants summary judgment as to IC's selection and maintenance of investments. Because there is no breach of duty, the Court need not consider whether Plaintiffs sustained any loss.

### 2. Monitoring Recordkeeping Fees

The undisputed facts show that IC acted prudently in monitoring the Plan's recordkeeping fees.

### i. IC's Process

It is undisputed that Fiducient, as part of the Plan fee review, conducted annual fee benchmarking throughout the Class Period. See Defs.' SUMF ¶ 122. During this time, Fiducient never reported that the recordkeeping fees were unreasonable. Id. ¶ 144. In fact, throughout the

---

[9] The Court further notes that Plaintiffs compare the two funds to benchmark indices compiled in 2022. See Dyson Rep. ¶ 59; see also id. Ex. C. But that data was unavailable to IC when it made its decision to retain the funds, see Defs.' Br., ECF No. 86.2, at 12, and such 20/20 hindsight cannot be used to impose liability, see In re Unisys Sav. Plan Litig., 74 F.3d at 432.; see also supra Section III.A (citing cases).

Class Period, the recordkeeping fees decreased significantly.  Id. ¶ 115.[10]  And in 2021, IC conducted an RFI for recordkeeping services, soliciting bid proposals from certain providers.  Id. ¶ 125.  These undisputed facts demonstrate that IC's process in evaluating the Plan's recordkeeping fees was prudent.  See Omnicom, 2022 WL 18674830, at *16 (citing Chao v. Merino, 452 F.3d 174, 182 (2d Cir. 2006)) ("ERISA does not dictate 'any particular course of action' with regards to fees, but it does require a 'fiduciary . . . to exercise care prudently and with diligence under the circumstances then prevailing.'").

### ii.    The Plan's Recordkeeping Fees

Plaintiffs argue, using IC's own benchmarking from the 2021 RFI, that the Plan could have negotiated a $23 per participant recordkeeping fee and therefore did not conduct a competitive bidding process.  See Pls.' Opp'n. at 29.  The Court disagrees.

Defendants explain that in soliciting recordkeeping pricing, IC requested four different pricing tiers based on different plan types, and that the $23 price came from a Tier Four proposal—requiring changes to its stable value fund and GoalMaker as the Plan's QDIA—as opposed to the Tier One open architecture pricing plan, where the Plan was not bound to the use the Recordkeeper's property products.  Defs.' SUMF ¶¶ 127–128.  IC did consider the alternate fee tiers as well as lower costs offered in the same tier by certain providers—but decided to remain with its recordkeeper because it felt that "the minimal cost savings that could have been achieved . . . would have been offset by the risk of error . . . and disruption to Evonik."  Id. ¶ 133.

As an initial matter, this evidence does not suggest a breach of a duty of prudence.  See Albert v. Oshkosh Corp., 47 F.4th 570, 579 (7th Cir. 2022), reh'g denied, No. 21-2789, 2022 WL 4372363 (7th Cir. Sept. 21, 2022) ("[T]he cheapest investment option is not necessarily the one a prudent fiduciary would select."); McCaffree, 2023 WL 2728787, at *14 (citing Ramos v. Banner Health, 461 F. Supp. 3d 1067, 1132 (D. Colo. 2020) (finding that "[a] high fee alone does not mandate a conclusion that recordkeeping fees are excessive; rather, fees must be evaluated relative to the services rendered.") (internal citations omitted), aff'd, 1 F.4th 769 (10th Cir. 2021)).  Defendants properly considered each provider's bids and the consequences of each.

Plaintiffs seem to have two responses to the fact that the $23 bid would have required Defendants to change the Plan's services.  First, they argue that the Plan may not have needed to eliminate GoalMaker as the QDIA had they negotiated and explored the providers' responses further.  The Court finds this argument too speculative to pose a triable issue of fact.  See Torretti v. Main Line Hosps., Inc., 580 F.3d 168, 179 n.16 (3d Cir. 2009); Ramara, Inc. v. Westfield Ins. Co., 814 F.3d 660, 666 (3d Cir. 2016).

Second, to the extent Plaintiffs suggest that Defendants should have been willing to change the Plan's QDIA or stable value fund, they did not set forth any evidence showing that such a change would have had a de minimis impact on the Plan.  Defs.' RSUMF ¶ 183.  To the contrary,

---

[10] Irrespective of process, courts have found that an overall decrease in recordkeeping fees supports a finding of objective prudence.  See Nunez v. B. Braun Med., Inc., No. 20-4195, 2023 WL 5339620, at *12 (E.D. Pa. Aug. 18, 2023) (finding objective prudence in part because "recordkeeping fees per participant largely experienced a downward trajectory"); see also supra note 5.

changing the Plan's services would have required IC to incorporate certain assets and, according to Defendants, thereby replace most of its investments.  Id.; Dyson Dep. Tr., ECF No. 86.17, 131:8–11.  A fiduciary need not accept drastic changes to the plan simply to attain the lowest fee.  See Nunez, 2023 WL 5339620, at *11 (finding it reasonable for the fiduciary to maintain open architecture pricing because the alternative would require dramatic changes that "may not have been worth the ultimate savings in recordkeeping expenses").  The Court finds that Defendants' decision to keep the Plan's QDIA and stable value fund was reasonable and, therefore, the $23 fee cannot serve as a meaningful benchmark.

The Court therefore grants summary judgment with respect to IC's monitoring of recordkeeping fees.  Because there is no breach of duty, the Court need not evaluate loss.

### B.  Duty to Monitor Other Fiduciaries

Plaintiffs assert that Evonik, the President, and the Board breach their duty to monitor IC in their selecting and maintaining investment options and monitoring of recordkeeping fees.  See generally Am. Compl., ECF No. 46.  But Plaintiffs "cannot maintain a claim for breach of the duty to monitor absent an underlying breach of the duties imposed under ERISA."  Falberg, 2024 WL 619297, at *4 (citing Rinehart v. Lehman Bros. Holdings Inc., 817 F.3d 56, 68 (2d Cir. 2016)).  Because the Court finds no breach of prudence with respect to IC, the Court grants summary judgment as to Plaintiffs' duty to monitor claim.

## IV.  CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment, ECF No. 86, is **GRANTED**.  This case is hereby **CLOSED**.

**SO ORDERED.**

_s/ Madeline Cox Arleo_
**MADELINE COX ARLEO**
**UNITED STATES DISTRICT JUDGE**

JA000010

## CERTIFICATE OF SERVICE

I hereby certify that counsel for all parties are registered as Filing Users of the Court's CM/ECF system and that a copy of the foregoing Brief and Appendix will be served electronically on this date by operation of the Court's CM/ECF system.


Dated: October 15, 2024                    */s/ Mark K. Gyandoh*